[Civ. No. 19882.   Second Dist., Div. Two.   June 22, 1954.]

MARIE F. LAUDER, Appellant, v. WRIGHT INVEST-
MENT COMPANY et al., Respondents.

Edwin H. Casey for Appellant.

Belcher, Kearney & Fargo and Lester E. Olson for Respondents.

FOX, J.—In 1950 defendants commenced subdividing operations on 36 acres of unimproved hillside ranch land located in the North Hollywood section of Los Angeles. Vineland Avenue is adjacent to defendants' subdivision and is the last improved street prior to defendants' development. Plaintiff's home is on the southeast corner of Vineland Avenue and Fruitland Drive, which latter street deadends at this intersection. Defendants' tract lies to the southwest of Vineland Avenue and at a higher elevation than plaintiff's property. There were unusually heavy rains in this vicinity during the period of January 15-18, 1952. As a result, quantities of water, mud and debris came down from defendants' subdivision upon plaintiff's property and into the buildings thereon, causing substantial damage.

Plaintiff charged defendants with negligence in carrying on their subdivision operations, and that they created and maintained a nuisance thereon. She sought both general and special damages and injunctive relief. From a judgment denying her any relief, plaintiff appeals.

The first step taken by defendants in the development of their subdivision was to employ Otto Baldus, an experienced subdivision engineer, for the purpose of laying out the subdivision and preparing a plan for its development. Mr. Baldus' plans were submitted to the Planning Commission of the city of Los Angeles for approval, and, in due course, were approved. Thereupon defendants employed the Donald Warren Company, highly respected soil engineers, to prepare grading plans. After a careful study of the topography of

the area and the soil structure such plans were developed by the Warren organization. These were approved by the appropriate city department. The grading, compaction and other work incidental thereto was done by a "well-known firm" in accordance with the grading plans.

The next step in the development of the subdivision was the installation of sewers. These were installed by a large, reputable sewer contractor. Permits for this work as well as for the paving of the streets and installation of curbs were obtained from the proper city department. Certificates approving the completed work were duly issued. The subdivision plans were submitted to the Los Angeles County Flood Control District, which "made an inspection of the property as to the amount of water shed" and "recommended the size of the drains." The plans, including the provisions for drainage, were approved by the district. A contract was then let to a responsible contractor for the installation of the indicated storm drains and catch basins. This work was inspected and duly approved.

Just prior to the heavy rain which caused the damage here complained of, the status of the work on the subdivision was as follows: The general grading over the tract had been finished, the rough street grading was completed, much of the concrete curbing had been poured, premixed flood control channels were graded but not yet paved, and the sewers installed with the trenches "refilled" and "puddled."* The only work remaining on the sewer installation was the lowering of the manhole covers. These could not be put in place until after final street grading and paving, which had not yet been done when the rain of January 15th came. During this storm the water gouged out the newly filled sewer trench, and the mud and water came down Vineland Avenue. The curbing on that street (which is not a part of the subdivision) ended just above plaintiff's property. The mud and water flowed onto plaintiff's property, entering her garage and basement, over the place where the curb would be had it extended to her property. There was no appreciable erosion on any part of the subdivision except in the neighborhood of the sewer line. Defendants, however, took immediate steps,

---

*This procedure was described as follows: "The dirt is filled and they dike it about every 30 or 40 or 50 feet, puddle it, sink it, let it settle, they install more dirt into the ditch, and then they have sometimes a long hose with a metal bar, and stick it into the ground and let the water go in there until finally it is settled."

through the use of sandbags during the storm, to prevent the sewer line from being washed out. Final paving was completed in September, 1952, and no further flood damage had occurred to plaintiff's property up to the time of the trial which was held in the middle of February, 1953, though in the meantime there had been other rains. In due course defendants put out ice plants on the banks of their subdivision and also scattered mustard seed over them to prevent erosion. They improved and enlarged some of the berms and installed others for protective purposes. Prior to the storm plaintiff had lived on this property for 16 years without suffering any flood damage.

At the outset the trial judge, upon stipulation of the parties, viewed plaintiff's home, defendants' subdivision, and the area involved in this action.

The court found that the defendants were not "careless or negligent in any respect whatsoever" and that they were not guilty of "any act or omission" which constituted "a threat" of further damage to plaintiff's property or which constituted a violation of any ordinance; that in developing and carrying forward this project "defendants employed competent engineers of good reputation to plan" the subdivision and selected "competent contractors to carry out such plan"; that all permits required in such an operation were secured and their terms and conditions complied with; and that prior to the "flood period of January, 1952, such contractors had commenced grading, bulldozing, and leveling the tract, in the course of which operation certain natural vegetation was removed and certain natural water courses and drainage channels altered." Other charges against the defendants were found to be untrue. The court further found that the damage to plaintiff's property "resulted solely from an inevitable and unavoidable accident and circumstance so far as defendants are concerned consisting of a severe and unusual fall of rain of unusual intensity and unforeseeable by defendants."

Plaintiff contends the evidence does not support these findings. In such contention she is in error.

In considering this question it is elementary that if there is any substantial evidence to support the findings they cannot be set aside by the reviewing court even though such court may believe the preponderance of the evidence is the other way; all questions of the weight of the evidence and the credibility of the witnesses are for the trier of the

facts; all conflicts must be resolved in favor of the successful party in the court below, and all legitimate and reasonable inferences drawn in support of the findings; and where divergent inferences can be reasonably deduced from the facts, the appellate court is without power to substitute its deductions for those of the trial judge. (*Jackson* v. *Burke,* 124 Cal.App.2d 519, 521-522 [269 P.2d 137].)

The "view" of plaintiff's premises, defendants' subdivision, and the topography of the surrounding area was "independent evidence which could be considered by the trier of facts in arriving at his conclusion and is substantial evidence in support of his findings consonant therewith." (*Saks & Co.* v. *City of Beverly Hills,* 107 Cal.App.2d 260, 266 [237 P.2d 32]; *Summers* v. *Parker,* 119 Cal.App.2d 214, 218 [259 P.2d 59]; *McCarthy* v. *City of Manhattan Beach,* 41 Cal.2d 879, 889 [264 P.2d 932].) Such a view of the locality not only enabled the trial judge to get a first-hand factual picture of the entire area, the nature and character of defendants' development, the grades and elevations, the location of the streets and the sewer line, the effort that had been made to prevent erosion of the banks, the location and exposure of plaintiff's property to future damage, but it also enabled the judge to better understand and evaluate the testimony of the witnesses and to determine the weight that should be given thereto. The independent evidence which the judge acquired from his inspection of the area is ample to support his finding that defendants had not created any situation or hazard that amounted to a nuisance, or endangered or depreciated the value of plaintiff's property, or which justified injunctive relief or any award of general damages. While there was evidence, principally opinion in character, on behalf of plaintiff which would have supported a different finding, the trial judge was not required to accept it rather than the on-the-spot factual picture his own personal inspection of the area revealed. It was his responsibility also to draw any reasonable inferences from the situation thus disclosed, and to make a proper deduction from the facts. In practical effect, the court simply resolved the conflict between what he saw and the testimony he heard. This, of course, is binding on a reviewing court.

Plaintiff, however, insists the court's view of the area at the time of the trial is without significance in passing on the alleged negligence of the defendants since conditions were then different from those prevailing when the storm of

January, 1952, descended. There were naturally some changes as a result of the completion of the subdivision, e.g., the final street grading and paving had been done and the manhole covers lowered into place in the sewer line. But there had been no change in the subdivision plan and layout, the general grading of the tract, and the rough street grading had been completed before the storm, the location of the streets and the sewer line had been established, the contours and elevations were the same, and the grades were substantially the same. It is therefore obvious that the change in the locality had not been such as to render the court's view valueless. Undoubtedly the judge's inspection of the area enabled him to better evaluate the testimony of the witnesses. It also gave him a picture of the physical conditions prevailing at the time of the storm and a foundation for his inferences and deductions when he had finished trying the case. It is true, of course, that the judge did not see the havoc the storm wrought, but that was not important because it related to the extent of the damage, which the court was not called upon to assess since he found defendants were not liable therefor.

Plaintiff points out that the fact defendants "complied with approved plans and permits does not exonerate them from liability or justify their creation or continuance of a nuisance" and that "governmental authority is no defense to the acts and conduct of defendants." In the first place, it should be noted that the trial court did not find—and the evidence did not require such a finding—viz., that defendants either created or continued any nuisance through their subdivision operations. Defendants did not offer evidence of compliance with governmental regulations as a defense to liability, but as evidence tending to establish their compliance with a reasonable standard of due care in the circumstances. Such evidence was obviously received only for that purpose.

Plaintiff seeks to deprecate the magnitude and intensity of the storm of mid-January, 1952. However, the "climatological Data" for North Hollywood in January, 1952, shows that on the 15th the precipitation was 1.70 inches; on the 16th, 4.96 inches; on the 17th, 1.26 inches; and on the 18th, 3.60 inches, thus making a total for the storm of 11.52 inches. These figures demonstrate the volume and intensity of the rainstorm. In fact, the precipitation for this storm is within approximately 3 inches of the average annual rainfall for

the Los Angeles area for the 16 prior years, such average being 14.54 inches.

Plaintiff points to the fact that during these 16 years there had been a greater rainfall in one 24-hour period in the year 1938. Her expert, however, testified that the 1938 flood "would be termed a fifty year cycle storm." There would thus appear to be ample justification for the trial court's characterization of the January, 1952, downpour.

The principal difficulty with plaintiff's argument is that she would have this court eliminate everything the trial judge saw when he viewed the area, accept the testimony of her witnesses without having it evaluated in the light of the physical facts which the judge observed upon his inspection of the locality, and draw all reasonable inferences in her favor. But under established principles we are not at liberty to do this.

Taking into consideration the trial judge's view of the area, the employment by defendants of competent engineers and contractors of good reputation to plan and develop the subdivision, their compliance with the rules and regulations of all governmental agencies, the magnitude and intensity of the storm and the other facts and circumstances, together with the inferences that may reasonably be drawn, it cannot be said, as a matter of law, that there is insufficient evidentiary support for the finding that defendants were not negligent in their subdivision operations. This finding sustains the judgment.

The judgment is affirmed.

Moore, P. J., and McComb, J., concurred.