[Civ. No. 4899.   Fourth Dist.   Aug. 1, 1955.]

MALCOLM MARS DOWNEY et al., Appellants, v. SANTA FE TRANSPORTATION COMPANY (a Corporation), Respondent.

Augustine, Bryans, Ragen & O'Connor for Appellants.

Robert W. Walker, Matthew H. Witteman, Luce, Forward, Kunzel & Scripps and Leland C. Nielsen for Respondent.

MUSSELL, J.—This action was brought to recover damages as a result of a collision between an automobile and a switch engine owned and operated by the Atchison, Topeka and Santa Fe Railway. Ernest Sherf, Jr., son of plaintiffs Mildred G. Sherf and Ernest Sherf, died as a result of injuries sustained in the accident and plaintiff Malcolm Mars Downey sustained severe cuts and bruises. The case was tried before a jury. Motions for nonsuit and for a directed verdict were denied. The jury returned verdicts for the plaintiffs Mildred G. Sherf and Ernest Sherf, assessing the damages at the sum of $12,000 and in favor of plaintiff Downey in the sum of $1,000. After the verdicts were returned and before judgment was entered thereon, defendant made a motion for judgment notwithstanding the verdicts. This motion was granted and plaintiffs appeal from the judgment entered thereon in favor of the defendant.

Appellants contend that the trial court erroneously set aside the verdicts of the jury since there was substantial evidence of defendant's negligence and to support the implied finding of the jury that the plaintiffs were not guilty of contributory negligence. Defendant concedes in its brief that contributory negligence on the part of Downey and Sherf was not shown as a matter of law. Therefore, the sole issue to be here determined is whether there was substantial evidence that the defendant was negligent.

The accident occurred about 2 a. m. on March 20, 1952, on Pacific Highway in the city of San Diego, where this highway is crossed by a spur track belonging to the defendant and

leading from its main line into the Convair plant, between Sassafras and Palm Streets. The automobile involved was owned by Dean Russell Myrick and was being driven by him in a southerly direction on Pacific Highway when it collided with defendant's switch engine, which, attached to and leading two box cars, was being backed across Pacific Highway from west to east. Sherf and Downey were guest passengers in the automobile. Sherf was sitting in the front seat next to the driver and Downey in the rear seat at the time of the accident.

Pacific Highway, where it is crossed by the spur track, is a 90-foot, six-lane highway, extending northerly and southerly and divided by a raised center island. To the north of the track, approximately 35 feet and on the west side of the highway, there was located a crossarm warning post. This post was directly south of a palm tree, which partially obscured the sign to the view of southbound traffic. About 10 feet north of the spur track, and partially obliterated, there were two parallel white lines on the highway. There was a small circular sign, bearing the letters "R. R." on the west side of the highway, approximately 190 feet north of the track. As shown in plaintiffs' Exhibit 10, there are two Convair buildings on the west side of the highway, one south of the track and the other one north of it, the two being approximately 35 feet apart. The spur track runs between the two buildings and to a gate through which trains enter and leave the Convair grounds. There is a pedestrian overpass which crosses the highway about 45 feet south of the track. This overpass has a clearance of approximately 15 feet and is lighted with four electric lights on standards approximately 6 feet high and set on top of the northerly edge of the overpass. There are two street lights on the west side of the highway, one set into the sidewalk about 120 feet to the north of the crossing and the other about 40 feet south of the crossing. Another street light is set into the sidewalk several feet north of the crossing on the east side of the highway. Approximately 300 feet north of the spur track Sassafras Street intersects Pacific Highway from the east and southbound traffic on Pacific Highway is there controlled by electrically operated signals. There is no electrically controlled bell or wigwag signal north of the spur track to warn southbound traffic on the highway of the existence of the crossing.

Myrick was driving south on the highway. When he went through the intersection of Sassafras Street and Pacific High-

way the electrically operated traffic signal was green for southbound traffic. He was traveling in the lane next to the center island at a speed of about 35 to 40 miles per hour. On approaching the spur track he applied his brakes and swerved to the left. His car struck the engine approximately 8 feet back from the leading ledge, resulting in the death of Myrick and Sherf and personal injuries to Downey.

William D. Brown, footboard switchman for defendant, testified that he was a member of the switch crew involved in the accident. Before the accident they had been switching on the Convair property west of Pacific Highway. The engine had hold of two cars and was backing up while he rode on the footboard of the leading ledge. The train stopped at the gate to Convair before entering the highway. The headlight of the engine was lit and the automatic bell was ringing. He walked out in the highway with a flare and white lantern and gave the "come ahead" signal. He walked out into the highway in a normal manner into the center of the southbound traffic lanes and north of the tracks. He saw one pair of headlights, southbound, approaching the tracks and they were about two blocks away. He waved the fusee to warn that car and then proceeded across the highway to stop the northbound traffic. He saw traffic approaching from the south after he had waved the engine on and it started its movement into the track. At that time he again heard the crossing whistle after the engine had started to move. He became aware of an impending crash as he was stopping the northbound traffic. He had preceded the engine about 8 feet as it entered and crossed Pacific Highway and was 3 or 4 feet north of the tracks until he got to the east side of the highway, at which time he crossed to a point 5 to 7 feet south of the tracks and at the approximate east edge of the first northbound traffic lane, where he started to stop the northbound traffic.

William H. Barnet, switchman, testified that as the engine approached the highway he was on the platform of the leading portion of the engine. They stopped at the gate before entering Pacific Highway. It had been raining earlier but it was then clear. The headlight was burning and he heard the automatic bell and air horn while the engine was stopped. He did not leave the platform while the train was stopped but he saw Brown start into the highway waving his lighted fusee signaling the traffic to stop. Brown got 8 or 10 feet into the highway before signaling the engine to start. When it started, Brown continued to swing the fusee, walking across

the highway into the northbound traffic lane, staying 8 or 10 feet ahead of the engine as it moved across at about 2 miles per hour. He, Barnet, looked to the north at the gate and could see two or three-tenths of a mile and he continued to look that way until the engine was probably out to the first lane of traffic. He saw one set of lights north beyond Sassafras but did not notice these lights after they got across the first lane of traffic as he was then watching northbound traffic and he had no warning of a collision until the engine stopped. He was aware of Brown's position at all times and Brown had just gotten into the northbound lane with his fusee still lit when the collision took place. The engine stopped instantaneously with the collision, with the drawbar and a portion of the foot-board extending into the inside lane of northbound traffic. When the train stopped he, Barnet, immediately lighted a fusee and started stopping the southbound traffic and turning it around.

John Amon, engineer, testified that he stopped the engine at the gate before entering the highway. The weather was clear, he had the headlight on, he blew the air horn while they were stopped, he blew the whistle and kept blowing it and started into the intersection after Brown gave him the signal. He saw a southbound car coming about 1,000 feet and at that time he, Amon, was just about at the curb. He continued looking to the north until he got into the middle traffic lane and then looked to the south, from which there was traffic approaching. He was going 2 to 3 miles per hour and as the engine was first starting into the northbound traffic lane he heard the squeal of brakes and saw a car coming about 200 feet from the intersection. The automatic bell was operating at all times until after the accident and he continued whistling crossing series as he crossed the highway. The approaching car was traveling from 35 to 50 miles per hour.

Charles L. Olson, fireman, testified that after the train stopped at Pacific Highway Brown proceeded out into it with his white lantern and gave the engine a signal to go ahead; that he could tell the headlight was on because it is a recessed one and he could see the light hit the ground right in front of the engine; that the automatic bell was on and he heard the whistle blow before they started into the highway. As they started out he saw a pair of headlights rounding the curve about two-tenths of a mile north. The engine was traveling at between 2 and 3 miles per hour and the whistle was blowing as they were crossing. He heard the squeal of tires on

the car but did not see it after he first observed it two-tenths of a mile away.

Paul Hayes, a police officer, testified that he and another police officer were called to investigate the accident; that as they came south on Pacific Highway they saw flares ahead in the street and a diesel engine of a train broadside across the southbound lanes of Pacific Highway; that they examined the street and found approximately 45 feet of braking skid in the center southbound lane leading up to the vehicle and also dirt and debris in the street at the tracks. On their arrival all the windows of the car were up, the radio was still on and playing rather loudly. Officer Walker testified that he participated in the investigation of the accident and observed that the ornamental street lights were lit as well as the lights on top of the pedestrian overpass. When he arrived at the scene of the accident he examined the car, found all the windows rolled up and the radio playing. Both he and officer Hayes testified that in their opinion Downey was under the influence of intoxicating liquor.

Downey testified that as they approached the crossing he was sitting in the back seat of the car. He was wide awake and was not sure whether the windows of the car were up or down or whether the radio was playing. Myrick was driving the car in "a good manner" and was not driving fast. The traffic light was green at the Sassafras intersection when they passed through. He did not hear the ringing of a bell of any kind or any whistle or siren and did not hear a warning of any type.

█ At the close of the evidence the jury was taken to view the premises. As is stated in *Anderson* v. *State,* 61 Cal. App.2d 140, 145 [142 P.2d 88]:

"What they saw there is evidence and from its very nature is not incorporated in the written record. We are required to presume that evidence not included in the record supports the verdict and judgment. (*Haase* v. *Central Union H. S. Dist.,* 27 Cal.App.2d 319 [80 P.2d 1044].) Evidence obtained by the trier of fact viewing the premises has been held sufficient to support a judgment." (Citations.)

It is appellants' first contention that the view of the scene by the jury disclosed that defendant failed to use care commensurate with the probable danger and was therefore guilty of negligence.

In *McCarthy* v. *City of Manhattan Beach,* 41 Cal.2d 879, 889 [264 P.2d 932], in an action wherein plaintiffs sought a

judgment declaring that a zoning ordinance restricting the use of their oceanfront property to beach recreational purposes was null and void as applied to them, the court said: "The trial judge's view of plaintiffs' property with the consent of counsel is evidence in the case and 'may be used alone or with other evidence to support the findings.'" (Citations.) In *Gates* v. *McKinnon*, 18 Cal.2d 179, 182-183 [114 P.2d 576], it is stated: "The law is clear that when a view of the scene of an accident is made by the trier of facts the conditions observed and properly bearing on the case, are independent evidence which may be considered by the trier of facts in arriving at its decision." See also *Anderson* v. *State, supra*, and also *Lauder* v. *Wright Inv. Co.*, 126 Cal.App.2d 147, 151 [271 P.2d 970], where the court said: "The 'view' of plaintiff's premises, defendants' subdivision, and the topography of the surrounding area was 'independent evidence which could be considered by the trier of facts in arriving at his conclusion and is substantial evidence in support of his findings consonant therewith.'" In *Peri* v. *Los Angeles Junction Ry. Co.*, 22 Cal.2d 111, 120, 121 [137 P.2d 441], the court held that: "The question of the negligence of the railroad operator is ordinarily one of fact in crossing cases as it is in other negligence cases." And "The conditions with respect to the ability of a traveler on the highway to observe the train approaching the crossing and the character of the crossing may be a basis for the conclusion of the trier of fact that the defendant failed to conform to the required standard of care in respect to the warnings it must give of the approach of the train to the crossing."

In the instant case the question of whether the defendant failed to use reasonable care, corresponding to the circumstances, in warning southbound traffic on the highway at the time of the accident was one of fact for the jury. ■ The photographs of the crossing and the other evidence, together with the jury's view of the premises, furnished sufficient substantial evidence to support the implied finding that the defendant failed to maintain adequate warning signs at the crossing. The evidence shows that the engine would not be visible to southbound traffic until it came out between the two Convair buildings on the west side of the highway; that the opening between these two buildings was only 35 feet; that the pedestrian overpass was approximately 45 feet south of the track; that the crossing sign was partially obscured by a palm tree; that there was no wigwag or warning bell at the crossing; that the Sassafras intersection was only about 300 feet north

of the crossing; that the highway was a well traveled, six-lane highway; and the accident happened on a dark night. Under these circumstances we cannot hold as a matter of law that the crossing was adequately equipped with warning signs or devices at the time of the accident and conclude that the determination of this question was one of fact for the jury.

Appellants' next contention is that the evidence reveals that the defendant was negligent in failing to give such warning to southbound traffic on the highway as would amount to reasonable care commensurate with the probable danger to be avoided. This was likewise a question of fact for the jury. In this connection there was evidence that Brown, the footboard switchman, proceeded about 8 feet in front of the engine as it crossed the highway. When he was a few feet from the curb he waved a fusee and then proceeded across the street to warn northbound traffic. He remained across the street warning northbound traffic with his fusee until the accident happened. The jury may well have inferred that the fusee was not a warning to southbound traffic at the time the accident occurred and that defendant's employees failed to properly warn southbound traffic as the engine crossed the highway.

There was a conflict in the evidence as to whether the bell on the engine was ringing and the whistle blowing at the time of the accident. ■ The members of defendant's train crew all testified that they heard both the bell and whistle. However, Downey testified that he did not hear the bell or whistle and did not hear a warning of any type. If he was in a position to have heard the bell or whistle, had either in fact been sounded, his testimony was sufficient to raise a conflict with the positive testimony that such warning was given. (*Peri* v. *Los Angeles Junction Ry. Co.*, *supra*, 118.) We cannot hold as a matter of law that Downey was not in a position to hear the bell or whistle, if these signals in fact had been given. This question was one of fact for the jury. (*Jones* v. *Southern Pac. Co.*, 74 Cal.App. 10, 26 [239 P. 429]; *Switzler* v. *Atchison, T. & S. F. Ry. Co.*, 104 Cal.App. 138, 146, 147 [285 P. 918].) ■ It was the duty of those in charge of the train to give notice of the approach of the engine when approaching the highway and its traveling over the highway by all warnings reasonably necessary under the conditions existing at the time and place of the accident. (*Lund* v. *Pacific Elec. Ry. Co.*, 25 Cal.2d 287, 298 [153 P.2d 705].) Whether the defendant was negligent in the performance of that duty was a question of fact for the jury.

The trial court herein denied defendant's motion for a nonsuit and a directed verdict and then granted the motion for judgment notwithstanding the verdict. ▮ As was said in *Card* v. *Boms,* 210 Cal. 200, 202 [291 P. 190] :

"The right of the trial court to set aside a verdict and enter a contrary judgment is absolutely the same as its right to grant a nonsuit. (Sec. 629, Code Civ. Proc.; *Estate of Caspar,* 172 Cal. 147 [155 P. 631] ; *Perera* v. *Panama-Pacific Intl. Exp. Co.,* 179 Cal. 63 [175 P. 454] ; *Hunt* v. *United Bank & Trust Co. of California, ante* [210 Cal.], p. 108 [291 P. 184].) The court should, therefore, grant such a motion when, and only when, disregarding conflicting evidence, and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff. (*Estate of Caspar, supra; Perera* v. *Panama-Pacific Int. Exp. Co., supra.)* "

See also *Palmquist* v. *Mercer,* 43 Cal.2d 92, 95 [272 P.2d 26], where the court said :

"A motion for nonsuit may properly be granted '. . . when, and only when, disregarding conflicting evidence, and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff.' (*Card* v. *Boms,* 210 Cal. 200, 202 [291 P. 190] ; see also *Blumberg* v. *M. & T. Inc.,* 34 Cal.2d 226, 229 [209 P.2d 1] ; *Golceff* v. *Sugarman,* 36 Cal.2d 152, 153 [222 P.2d 665].) 'Unless it can be said as a matter of law, that . . . no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury.' (*Estate of Lances,* 216 Cal. 397, 400 [14 P.2d 768] ; see also *Raber* v. *Tumin,* 36 Cal. 2d 654, 656 [226 P.2d 574].) "

We are of the opinion that under the circumstances shown by the record the trial court was in error in determining that there was no evidence which gave substantial support to the verdict reached by the jury.

The judgment is reversed.

Barnard, P. J., and Griffin, J., concurred.