[No. E005868. Fourth Dist., Div. Two. Sept. 25, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD LAWRENCE BUTTLES, Defendant and Appellant.

**COUNSEL**

F. Thos. Caporael, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Janelle B. Davis, Patti W. Ranger and Yvonne H. Behart, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**TIMLIN, J.—**

## I

### INTRODUCTION

Richard Lawrence Buttles (defendant) has appealed from a judgment entered after a jury found him guilty of one count of willfully discharging a firearm at an occupied motor vehicle (Pen. Code, § 246) and one count of carrying a loaded firearm in a vehicle while in a public place. (Pen. Code, § 12031, subd. (a).)

## II

### FACTS

Oscar Smith was driving a tractor, behind which he was pulling two bottom dump sand and gravel trailers, on Highway 60 where it splits off from Highway 215 near Moreno Valley. He made several trips along the same route between 7 a.m. and 4:30 p.m. He was playing his radio, and did not notice any gunfire during that period.

However, the Cieluch family, who were driving along that same stretch of highway at about 10 a.m., did. Dawn Cieluch, who was then 15 years old, noticed a blue Fairmont with 2 men in it driving on her left next to the Cieluchs' car. She particularly noticed the passenger in the car, Richard McCauley, because his arm was covered with elaborate tattoos. As she watched the car, the driver, later identified as defendant, reached with his right hand toward the middle of the front seat, and then raised a small dark handgun to the driver's window. He then fired the gun as a tractor/trailer rig was passing his car on the left.

Dawn ducked down and warned her father, who was driving, that "[H]e's got a gun!" Mr. Cieluch had already noticed the Fairmont because

of its erratic movements, and had been trying to stay clear of it. Just before Dawn called out this warning, he had heard what he thought was a tire blow out on the Fairmont. He saw the Fairmont swerve onto the dirt shoulder and stop, but he did not see any flat tire, and he saw defendant and McCauley laughing. Mrs. Cieluch, as this was taking place, had the foresight to write down the license number of the Fairmont. The Cieluchs pulled off the highway and notified the Riverside Sheriff's Office about the shooting.

A sheriff stopped the Fairmont as it was once again traveling down the highway. Defendant exited the car and walked towards the officer who had stopped them. McCauley, in contrast, left the car and ducked down behind the front fender of the Fairmont until the officer drew his gun and ordered him to stop. A search of the car disclosed a loaded semiautomatic .38-caliber handgun partially concealed under a shirt on the driver's seat, and a .22-caliber semiautomatic handgun concealed inside the center console. When questioned by the arresting officer, McCauley told the officer that he had heard a loud noise. When he looked over, he saw a gun in defendant's hand.

Defendant was charged as noted above. At trial, McCauley changed his story and claimed that he had fired the gun. He also denied having told the investigating officer that he had heard a loud noise and then had seen a gun in defendant's hand. He testified that he was currently in prison, but that nothing happened to "snitches" in prison.

The investigating officer testified that McCauley in fact previously had stated that it was defendant who had the gun. He also testified, over objection, that during a booking search of McCauley's person, an eyeglass case containing a hypodermic syringe and five bags of methamphetamine was discovered. This testimony came in despite defendant's Evidence Code section 352 objection.

Dawn testified that she had been shown two photographic lineups, and that in one lineup, she had identified defendant as the driver of the Fairmont, and in the other she had identified McCauley as the passenger, even though the lineup did not show McCauley's tattoos. On cross-examination, Dawn admitted that at an earlier Department of Motor Vehicles (DMV) license revocation hearing she had stated that she was unsure who fired the gun. However, she explained this discrepancy with her current testimony by stating that she had been nervous, scared and confused at that hearing. She testified that she was positive that defendant had fired the shot. Defendant countered her explanation by putting on the testimony of the DMV hearing

officer that Dawn had not appeared to be confused at the license revocation hearing.

Two other officers who interviewed Dawn testified about her statements to them that she saw defendant fire the gun, and that the gun was pointed at a tractor/trailer rig. This testimony came in over defendant's objection that it was hearsay.

Mr. Smith, who had been located by the sheriff's office as the probable victim, testified that he had not heard any shots, but that he had been playing his radio. An examination of his truck and trailers did not reveal any bullet holes or marks. However, Dawn and Mrs. Cieluch both identified Mr. Smith's truck as being similar to the one they had seen passing defendant's car when defendant fired the shot.

## III

### DISCUSSION

A. *Is a Tractor/Trailer Rig an "Occupied Motor Vehicle" as That Term Is Used in Penal Code Section 246?*

Penal Code section 246 provides: "Any person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house, occupied building, occupied motor vehicle, occupied aircraft, inhabited housecar, as defined in Section 362 of the Vehicle Code, or inhabited camper, as defined in Section 243 of the Vehicle Code, is guilty of a felony, and upon conviction shall be punished by imprisonment in the state prison for three, five or seven years, or by imprisonment in the county jail for a term of not less than six months and not exceeding one year.

"As used in this section, 'inhabited' means currently being used for dwelling purposes, whether occupied or not."

Penal Code section 247, subdivision (b) provides, in relevant part: "Any person who discharges a firearm at an unoccupied motor vehicle or an uninhabited building or dwelling house is guilty of a public offense punishable by imprisonment in the county jail for not more than one year or in the state prison. . . ."

■ Defendant asserts that both Penal Code section 246 and Penal Code section 247 relate to discharging a firearm at a motor vehicle, and therefore they should be construed together. He also asserts that it is apparent that the Legislature intended that those who discharge a firearm at an occupied

motor vehicle should be punished more severely because there is greater danger to life when an occupied motor vehicle is fired upon than when an unoccupied vehicle is the target.

Thus far, defendant's argument makes sense. Defendant next asserts, however, that the two references to Vehicle Code sections in Penal Code section 246 "manifest a legislative intent that the definitions of the Vehicle Code are to be applied to the construction of the statute." Defendant, based upon this premise, then argues that because Vehicle Code section 415 defines a motor vehicle as a vehicle which is self-propelled, and because Vehicle Code section 630 defines a trailer as a vehicle designed for carrying persons or property on its own structure and for being drawn by a motor vehicle and so constructed that no part of its weight rests upon any other vehicle, then only the tractor of a tractor/trailer rig is a "motor vehicle" within the meaning of Penal Code section 246. Defendant then asserts that because the evidence showed only that defendant discharged a weapon at the trailer, not the tractor, his conduct was not proscribed under Penal Code section 246.

There are two problems with this argument. First, defendant's argument is based on a faulty premise, i.e., that the Legislature intended the Vehicle Code definitions of all terms used in Penal Code sections 246 and 247 to be the applicable definitions, because it specifically referred to two such code sections for definitional purposes. However, it can be argued with equal persuasiveness that the fact that the Legislature cited two Vehicle Code sections to define only two of the many vehicle-related terms in these Penal Code sections is equally indicative of the fact that the Legislature did *not* intend to mandate that only Vehicle Code section definitions would be applicable to such other terms.

Second, an assumption that Vehicle Code section 415, defining motor vehicle as a vehicle which is "self-propelled," applies to the term "motor vehicle" as that term is used in Penal Code sections 246 and 247 does not necessarily lead to a concomitant conclusion that a tractor/trailer rig is not a "motor vehicle," but is instead a "motor vehicle" pulling a "trailer." As was held in *Miller* v. *Berman* (1942) 55 Cal.App.2d 569 [131 P.2d 18], despite the fact that under certain sections of the Vehicle Code a motor vehicle and a semitrailer are regarded as separate vehicles for the purpose of registration, when the two are joined together "for the purpose of both being moved over the highways, *the two may become one motor vehicle*." (*Id*. at p. 571, italics added.) (See also *Truck Ins. Exchange* v. *Torres* (1961) 193 Cal.App.2d 483, 492 [14 Cal.Rptr. 408] to the same effect: that a tractor and trailer, when hitched together and moving down a road, constitute a single vehicle.)

Accordingly, we hold that when a trailer and tractor are joined for the purpose of both being moved simultaneously over the highway by the self-propulsion of the tractor portion, such tractor/trailer rig comes within the meaning of a "motor vehicle" as used in Penal Code section 246. We further hold that when such a tractor/trailer rig is operated on a highway, it is an occupied motor vehicle within the meaning of that phrase as used in Penal Code section 246.

B. *Did the Trial Court Commit Prejudicial Error by Admitting Deputy McCafferty's Testimony About Dawn's Statements to Him?*

■ Defendant contends that Deputy McCafferty should not have been allowed to testify that Dawn told him that she had observed the defendant point his gun at the passing tractor/trailer rig and fire it. According to defendant, Dawn did not testify whether or not defendant pointed the gun at the tractor/trailer rig, and therefore McCafferty's testimony was not a prior inconsistent statement. It therefore could not come in under that exception to the hearsay rule.

However, defense counsel, on cross-examination of Dawn, elicited from her the following testimony:

"Q: At the time you heard the explosion or the shot, could you see actually where the gun was pointed?

"A: I saw it pointed toward the window.

"Q: But as far as where in the window, you really don't know, do you?

"A: Huh-uh."

This statement, that she did not know "where in the window" the gun was pointed, was inconsistent with her earlier statement to Deputy McCafferty that she saw defendant point his gun at the passing tractor/trailer rig.

A prior statement of a witness, inconsistent with her present testimony, is admissible if the witness (a) was given the opportunity to explain or deny while under cross-examination, or (b) even if not given that opportunity while under cross-examination, she still has the opportunity to take the stand, i.e., she has not been excused from giving further testimony. (Evid. Code, § 770.) The trial court also has broad discretion, even if the two circumstances noted above are not met, to allow in the evidence if "the interests of justice otherwise require." (*Ibid.*) "An absolute rule forbidding

introduction of such evidence where the specified conditions are not met may cause hardship in some cases. For example, the party seeking to introduce the statement may not have learned of its existence until after the witness has left the court and is no longer available to testify." (Cal. Law Revision Com. com., Deering's Ann. Evid. Code, § 770 (1986) p. 396.)

Here, after a significant amount of cross-examination over discrepancies in her testimony at the license revocation hearing and at trial, and after she had stated that her memory was very clear at the time she made her statements to the investigating officers, Dawn was excused subject to recall. Thus, she was still available to take the stand to explain or deny the statements which McCafferty later testified that she had made to him, and therefore McCafferty's later testimony about her earlier inconsistent statement was admissible.

### C. Was There Substantial Evidence That Defendant Actually Fired at an Occupied Motor Vehicle?

■ Defendant contends that there is not sufficient evidence that he fired at the motor vehicle; according to defendant, he might have fired into the air or at the ground. Defendant's contention is premised on his earlier argument that McCafferty's testimony about Dawn's statement that defendant fired at the vehicle should not have been admitted. We have determined that such evidence was properly admitted. However, even assuming for the sake of argument that this evidence should not have been admitted, there is still substantial evidence that defendant fired *at* the passing tractor/trailer rig, rather than into the air or at the ground.

Dawn's testimony, on two different occasions during trial, included her physical demonstration of how defendant had pointed the gun out the window of his car before firing it. Her demonstration, being something "presented to the senses . . . offered to prove the existence or nonexistence of a fact," (Evid. Code, § 140) is evidence which is sufficient to support the judgment against defendant. (See, e.g., *Hogue v. Southern Pacific Co.* (1969) 1 Cal.3d 253, 258-259 [81 Cal.Rptr. 765, 460 P.2d 965], and cases cited in 2 Witkin, Cal. Evidence (3d ed. 1986) Demonstrative, Experimental and Scientific Evidence, §§ 851, 852, at pp. 816-817, involving "views" of evidence outside the courtroom.)

What the trier of fact observes is itself evidence which may be used alone or with other evidence to support the judgment. (See *South Santa Clara etc. Dist.* v. *Johnson* (1964) 231 Cal.App.2d 388, 399 [41 Cal.Rptr. 846] and cases cited therein.) When what the trier of fact observed has not been made a part of the transcript on appeal, a reviewing court must assume that the

evidence acquired by such a viewing is sufficient to sustain the finding or judgment in question. (See *ibid.* and cases cited therein.) Furthermore, when there is a conflict between such evidence and other evidence, it is presumed that the trier of fact resolved the conflict by accepting the demonstrative evidence as being more credible, and this determination is binding on a reviewing court. (See *id.* at pp. 399-400. See also *Woolliscroft* v. *Starr* (1964) 225 Cal.App.2d 667, 670 [37 Cal.Rptr. 570]; *Lauder* v. *Wright Investment Co.* (1954) 126 Cal.App.2d 147, 151 [271 P.2d 970].)

Here, therefore, we must presume that Dawn's demonstration of the position of defendant's hand as he fired the gun was evidence that defendant pointed the gun at such an angle that the jury could have concluded that he had fired *at* the passing rig rather than at the ground or into the air.

**D.** *Did the Trial Court Commit Prejudicial Error by Admitting Evidence That Defendant's Companion, McCauley, Had a Substantial Amount of Methamphetamine on His Person When He and Defendant Were Arrested?*

Defendant objected to the admission of McCauley's possession of methamphetamine on the ground that such evidence was more prejudicial than probative. (Evid. Code, § 352.) The People argued that because defense counsel 1) had contrasted defendant's cooperativeness with McCauley's suspicious behavior when both were stopped by the sheriff, and 2) had elicited testimony from the arresting officer that he "got the impression he [McCauley] was possibly going to go to hide or hide something. That's why I drew my service revolver," the evidence of the methamphetamines found on McCauley was relevant to show that he had another reason, besides possibly being the person who had fired the shot, to be evasive when the car was stopped. The court stated, "I believe it has relevance to that issue. The objection will be overruled."

Defendant contends that the record here does not affirmatively show that the trial court weighed the probative value of this evidence against its prejudicial effect as required by *People* v. *Leonard* (1983) 34 Cal.3d 183, 187-188 [193 Cal.Rptr. 171, 666 P.2d 28]. He also argues that the evidence was not probative on the issue of whether defendant had fired the shot, and that therefore, but for the erroneous admission of this evidence, the jury might well have concluded that there was insufficient evidence to convict defendant of the crime of discharging a firearm at an occupied motor vehicle.

Although the trial court here did not explicitly state the factors related to prejudice versus probative value and its assessment of those factors in

making its ruling, such a failure in and of itself is not reversible error. Defendant must also demonstrate that the error resulted in a miscarriage of justice. (*People* v. *Montiel* (1985) 39 Cal.3d 910, 924-925 [218 Cal.Rptr. 572, 705 P.2d 1248].)

Defendant argues that he somehow might have been stigmatized because he was associating with someone who possessed drugs. On the other hand, an argument can be made that the jury might have been more likely to believe that McCauley, someone in possession of illegal drugs, was the kind of person who would fire an unprovoked shot at a passing car. In any event, given McCauley's statement at trial that it was he who had fired the shot, and defense counsel's emphasis, on cross-examination, of McCauley's evasive behavior when stopped, versus defendant's cooperativeness, the evidence was probative on the issue of whether McCauley's evasiveness showed consciousness of guilt as to the shooting, or whether it was explained by the fact that he was in possession of a controlled substance when the stop was made. Under such circumstances, the court's failure to weigh the probative value of such evidence against its possible prejudicial effect did not constitute a miscarriage of justice. There is no reasonable probability that the exclusion of such evidence would have resulted in a more favorable verdict for defendant.

IV

DISPOSITION

The judgment is affirmed.

Dabney, Acting P. J., and McDaniel, J.,* concurred.

---

* Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.