[No. E034238. Fourth Dist., Div. Two. Aug. 27, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVE EDWARD PHILPOT, Defendant and Appellant.

## COUNSEL

Anthony J. Dain, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, A. Natasha Cortina and Lise Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RICHLI, J.**—A jury found defendant guilty of two counts of unlawfully taking or driving a vehicle (Veh. Code, § 10851, subd. (a)) (counts 1 and 2); one count of grand theft of personal property (Pen. Code, § 487, subd. (a))[1] (count 3); and one count of misdemeanor battery (§ 242) (count 4). The jury also found true that defendant had sustained three prior strike convictions within the meaning of sections 667, subdivisions (b) through (i), and 1170.12, subdivisions (a) through (d). As a result, defendant was sentenced to 25 years to life on count 1, counts 2 and 3 were stayed pursuant to section 654, and he was sentenced to time served on count 4.

On appeal, defendant contends (1) his conviction on count 2 must be reversed because an automobile with an attached trailer supports only one conviction for unlawful driving or taking of a vehicle; (2) the trial court abused its discretion by refusing to strike his prior strike convictions; and (3) he is entitled to 110 days of additional presentence custody credits for time served. We agree with defendant that he is entitled to 110 more days of custody credits. We reject defendant's remaining contentions.

---

[1] All future statutory references are to the Penal Code unless otherwise stated.

I

## FACTUAL BACKGROUND

On September 5, 2002, Jose Montanez was working for Omar Martenez's gardening and landscaping business as a landscaper. On that date, Montanez drove his employer's 1985 Toyota pickup truck, license plate No. 2S31078, to Kern Memorial Chapel in Victorville. The truck had Martenez's 2001 Aztec utility trailer, license plate No. 1KC3494, which contained about $5,000 worth of Martenez's machinery and equipment used for landscaping, attached to it.

When Montanez arrived at the mortuary, he parked the truck in front of the chapel, placed the keys underneath a seat, and began working. After finishing, he returned to the front of the chapel and noticed that the truck and the attached trailer were missing. At Montanez's request, a chapel employee called the police while Montanez called his employer, Martenez.

Martenez thereafter drove to the mortuary to pick up Montanez. While en route, Martenez saw the truck on the opposite side of the freeway being driven by a White male, later identified as defendant. Martenez tried to turn around to follow the truck but was unable to do so in time. Martenez then drove to the mortuary and reported his observations to the responding officer, San Bernardino County Sheriff's Deputy Kelle Ammerman.

Deputy Ammerman headed to the freeway, and Martenez and Montanez followed. As they were driving on the freeway, Deputy Ammerman, Martenez, and Montanez saw the truck parked at a mechanic's shop on the other side of the freeway. However, by the time they turned around and arrived at the auto shop, the truck and trailer were gone. All of Martenez's gardening tools, however, were at the shop.

Jaime Jimenez owned the auto shop and explained that defendant drove to his shop and asked Jimenez to buy the equipment in the trailer. Defendant told Jimenez that he needed to sell his gardening equipment in order to have money for food and gas to go to Las Vegas because he was having problems with his wife. Defendant asked for $400 for the equipment, but Jimenez only had $230 on him at the time. Defendant agreed to accept $230 and gave Jimenez a hedge trimmer, a weed trimmer, and two lawn mowers. At Jimenez's request, defendant signed a sales receipt, which included defendant's driver's license number. Jimenez also wrote down the license plate number of the truck and trailer. After the sale of the stolen equipment, defendant got back into the truck and drove away.

Meanwhile, Martenez called two other employees, Omar and Ulises Dominguez, to assist in the search for the truck. The Dominguez brothers drove to the area where the truck had last been spotted and saw defendant drive past them in the truck on the opposite side of the road. The Dominguez brothers made a U-turn and stopped next to defendant at a red light. Martenez's trailer was still attached to the truck. Omar asked defendant to pull over. Defendant did not respond or pull over but continued to drive forward.

The Dominguez brothers followed defendant for about 20 minutes until defendant got trapped in an alley by another car. The Dominguez brothers approached the truck. Omar asked defendant to turn the truck off and told him that he worked for Martenez and that the truck was stolen. When defendant refused to turn the truck off, Ulises opened the passenger side door and attempted to turn off the truck's engine. As he reached inside the truck for the keys, defendant struck Ulises on the left side of his upper cheek. After defendant refused to comply with Omar's request to exit the truck, Omar grabbed defendant and pulled him out of the truck. After a brief struggle, Ulises tied defendant's feet up with some rope and called the police.

Deputies Johnson and Ammerman arrived and arrested defendant. As Deputy Ammerman escorted defendant to his patrol vehicle, defendant stated that he had just been walking down the alley when the Dominguez brothers appeared out of nowhere and began beating him up. Deputy Ammerman then pat-searched defendant and found $230 cash in his pocket.

Deputy Ammerman thereafter took defendant to the hospital because defendant appeared to be somewhat injured. While defendant was receiving medical attention, Deputy Ammerman overheard defendant say, "I know I committed a crime, and I was wrong; but they didn't need to do that to me. I would like to take action against them."

## II

## DISCUSSION

### A. *Defendant's Conviction on Count 2*

Defendant was convicted on count 1 for the unlawful driving or taking of the truck, and on count 2 for the unlawful taking or driving of the attached trailer. Defendant contends his conviction on count 2 must be reversed because the theft of an automobile with an attached trailer supports only one conviction for vehicle theft. The People respond that because Vehicle Code section 10851, subdivision (a) punishes the unlawful driving or taking of a

"vehicle," not a "motor vehicle," and because a trailer qualifies as a vehicle under the Vehicle Code, defendant was properly convicted of two counts of vehicle theft. We are inclined to agree with the People.

Like the parties, we have found no cases on point directly addressing this particular issue and note that this issue presents a close call. However, we believe the canons of statutory construction and an analysis of the language of Vehicle Code sections 670 and 10851 supports the People's position.

■ Although our analysis of legislative history has been to no avail, we reason that under the plain language of Vehicle Code section 10851, a person who steals a truck with an attached trailer may properly be convicted of two counts of violating Vehicle Code section 10851. ■ In reviewing this and other statutory provisions, we are mindful of the rules governing statutory interpretation, which are well settled. "We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.]" (*People v. Flores* (2003) 30 Cal.4th 1059, 1063 [135 Cal.Rptr.2d 63, 69 P.3d 979]; see also *People v. Coronado* (1995) 12 Cal.4th 145, 151 [48 Cal.Rptr.2d 77, 906 P.2d 1232].) To determine legislative intent, we first examine the words of the statute, applying " 'their usual, ordinary, and common sense meaning based upon the language . . . used and the evident purpose for which the statute was adopted.' " (*People v. Granderson* (1998) 67 Cal.App.4th 703, 707 [79 Cal.Rptr.2d 268], quoting *In re Rojas* (1979) 23 Cal.3d 152, 155 [151 Cal.Rptr. 649, 588 P.2d 789]; see also *Flores*, at p. 1063.) " ' . . . If there is no ambiguity in the language of the statute, "then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs." [Citation.] "Where the statute is clear, courts will not 'interpret away clear language in favor of an ambiguity that does not exist.' [Citation.]" ' [Citation.]" (*Coronado*, at p. 151.) If the words of the statute are ambiguous, a court may resort to "extrinsic sources, including the ostensible objects to be achieved and the legislative history." (*Ibid.*) Applying these rules of statutory interpretation, a court " 'must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' [Citation.]" (*Ibid.*)

■ Here, the language of Vehicle Code section 10851, subdivision (a) is clear. That section provides, in pertinent part, "Any person who drives or takes a *vehicle* not his or her own, without the consent of the owner thereof,

and with intent either to permanently or temporarily deprive the owner thereof of his or her title to or possession of the *vehicle*, whether with or without intent to steal the vehicle . . . is guilty of a public offense . . . ." (Italics added.) Vehicle Code section 670 defines a vehicle as "a device by which any person or property may be propelled, moved, or *drawn* upon a highway, excepting a device moved exclusively by human power or used exclusively upon stationary rails or tracks." (Italics added.) "Vehicle" is defined as "a means of carrying or transporting something: conveyance . . . ." (Webster's 3d New Internat. Dict. (1993) p. 2538.) Black's Law Dictionary defines "vehicle" as "[t]hat in or on which persons, goods, etc. may be carried from one place to another, especially along the ground. Any moving support or container fitted or used for the conveyance of bulky objects; a means of conveyance. . . . Term refers to every device in, upon or by which a person or property is or may be transported upon a highway." (Black's Law Dict. (6th ed. 1990) p. 1393, col. 2.)

 Specifically, the word "vehicle" is unambiguous. It clearly includes a device "by which any person or property may be . . . drawn upon a highway . . . ." (Veh. Code, § 670.) Vehicle Code section 100 states, "Unless the provision or context otherwise requires," the definition provided "shall govern the construction of this code." We agree with the People that because nothing in Vehicle Code section 10851 or the context requires otherwise, the definition of "vehicle" set forth in Vehicle Code section 670 governs the construction of Vehicle Code section 10851 and the meaning of "vehicle."[2] We " ' " 'will not "interpret away clear language in favor of an ambiguity that does not exist." ' " ' " (*People v. Gutierrez* (1997) 52 Cal.App.4th 380, 389 [60 Cal.Rptr.2d 561].)

The cases relied upon by defendant are inapposite here. In *Miller v. Berman* (1942) 55 Cal.App.2d 569 [131 P.2d 18] (*Miller*), the Fourth District Court of Appeal considered the liability of a semitrailer owner for damages caused by the negligence of the owners and driver of a truck/tractor to which the trailer was attached. The trial court held the trailer owner liable for wrongful death damages pursuant to the permissive use/private owner liability provisions of former Vehicle Code section 402 (now Vehicle Code section 17150). (*Miller*, at p. 569.) The Court of Appeal reversed, holding the trailer owner was not the owner of a "motor vehicle" within the meaning of Vehicle Code section 402 so as to render him liable for damages caused by the tractor owner/driver's negligence. (*Miller*, at p. 571.) Under their respective statutory definitions in the Vehicle Code, the court held the truck/tractor was a "motor

---

[2] We note that although the Legislature may have not envisioned the circumstances of this case, the statutory language that currently exists and the rules of statutory interpretation support the People's position.

vehicle" and the semitrailer was a "vehicle" but not a "motor vehicle."[3] (*Ibid.*) The court concluded when the front of the semitrailer rests on the rear of the truck/tractor to be moved over the highways, "the two may become one motor vehicle." (*Ibid.*)

Subsequently, in *Truck Ins. Exchange v. Torres* (1961) 193 Cal.App.2d 483 [14 Cal.Rptr. 408], the Court of Appeal, citing the holding in *Miller*, held that "[h]itched together as they were the tractor and trailer constituted a single vehicle." (*Truck Ins. Exchange*, at p. 492.)

Citing *Miller*, *supra*, 55 Cal.App.2d 569, and *Truck Ins. Exchange v. Torres*, *supra*, 193 Cal.App.2d 483, the Court of Appeal in *People v. Buttles* (1990) 223 Cal.App.3d 1631 [273 Cal.Rptr. 397], which was a criminal case, expressly approved both of these decisions. (*Id.* at p. 1637.) With respect to *Miller*, the court stated, "[D]espite the fact that under certain sections of the Vehicle Code a motor vehicle and a semitrailer are regarded as separate vehicles for the purpose of registration, when the two are joined together 'for the purpose of both being moved over the highways, *the two may become one motor vehicle.*' " (*Buttles*, at p. 1637, quoting *Miller*, at p. 571.) Regarding *Truck Ins. Exchange*, the court stated that a "tractor and trailer, when hitched together and moving down a road, constitute a single vehicle." (*Buttles*, at p. 1637.)

In *People v. Buttles*, *supra*, 223 Cal.App.3d 1631, the question on appeal was whether a tractor/trailer rig was an occupied vehicle for purposes of a violation of section 246, which prohibits shooting at an occupied motor vehicle. In that case, a motorist on the freeway reported to the police she saw the defendant in another car fire a weapon at a passing tractor/trailer rig. The defendant was arrested and charged with a violation of section 246. The tractor was hauling two sand and gravel trailers, and the driver testified he heard nothing and was unaware someone had fired shots at his rig. On appeal the defendant argued because he only fired at the trailer and not the tractor his conduct was not proscribed under section 246. (*Buttles*, at

---

[3] *Miller* interpreted former Vehicle Code sections 31, 32, and 37 defining vehicles, motor vehicles, and trailers. (*Miller*, *supra*, 55 Cal.App.2d at p. 571.) These sections were renumbered and substantively identical definitions pertinent to the case at bar exist today in Vehicle Code sections 415, 630, and 670.

Vehicle Code section 415 defines a "motor vehicle" as "a vehicle that is self-propelled." (Veh. Code, § 415, subd. (a).)

Vehicle Code section 630 defines a "trailer" as "a vehicle designed for carrying persons or property on its own structure and for being drawn by a motor vehicle and so constructed that no part of its weight rests upon any other vehicle."

Vehicle Code section 670 defines a "vehicle" as "a device by which any person or property may be propelled, moved, or drawn upon a highway, excepting a device moved exclusively by human power or used exclusively upon stationary rails or tracks."

pp. 1634–1636.) Based on the authorities in *Miller, supra,* 55 Cal.App.2d 569, and *Truck Ins. Exchange v. Torres, supra,* 193 Cal.App.2d 483, the Court of Appeal disagreed and held that "when a trailer and tractor are joined for the purpose of both being moved simultaneously over the highway by the self-propulsion of the tractor portion, such tractor/trailer rig comes within the meaning of a 'motor vehicle' as used in Penal Code section 246." (*Buttles,* at p. 1638.) The court further concluded that "when such a tractor/trailer rig is operated on a highway, it is an occupied motor vehicle within the meaning of that phrase as used in Penal Code section 246." (*Ibid.*)

We are aware of no other authorities that have addressed an attached-trailer issue in this or any other contexts.

The cases discussed above do not support defendant's position because they have all held that when a trailer is attached to a *motor vehicle,* they become one single *motor vehicle.* (See *Miller, supra,* 55 Cal.App.2d 569, 571; *Truck Ins. Exchange v. Torres, supra,* 193 Cal.App.2d 483, 492; *People v. Buttles, supra,* 223 Cal.App.3d 1631, 1637.) Vehicle Code section 10851 proscribes the unlawful taking of a "vehicle," not the unlawful taking of a "motor vehicle." Defendant's argument requires this court to add the word "motor" in front of the word "vehicle" into Vehicle Code section 10851. " 'If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.' [Citations.]" (*People v. Morris* (1988) 46 Cal.3d 1, 15 [249 Cal.Rptr. 119, 756 P.2d 843], disapproved on another ground in *In re Sassounian* (1995) 9 Cal.4th 535, 543, fn. 5 [37 Cal.Rptr.2d 446, 887 P.2d 527].) The words of Vehicle Code section 10851 clearly refer to a vehicle. Moreover, Vehicle Code section 10850 provides, "The provisions of this chapter apply to *vehicles* upon the highways and elsewhere throughout the State." (Italics added.) If the Legislature had intended for Vehicle Code section 10851 to apply only to those who take "motor vehicles," it would have said so by using the phrase "motor vehicle," as it did in statutes in the preceding chapter. (See Veh. Code, §§ 10802 & 10803.) "When the Legislature uses materially different language in statutory provisions addressing the same subject or related subjects, the normal inference is that the Legislature intended a difference in meaning." (*People v. Trevino* (2001) 26 Cal.4th 237, 242 [109 Cal.Rptr.2d 567, 27 P.3d 283]; see also *People v. Roberge* (2003) 29 Cal.4th 979, 987 [129 Cal.Rptr.2d 861, 62 P.3d 97] [words should be given the same meaning throughout a code unless the Legislature has indicated otherwise].)

▮ In conclusion, because the language of Vehicle Code section 10851 clearly proscribes the unlawful taking of a "vehicle," and because a trailer qualifies as a "vehicle" under Vehicle Code section 670, defendant was

properly convicted of both unlawfully taking Martenez's truck and his attached trailer.[4]

### B. *Motion to Dismiss Prior Strike Convictions*

Defendant contends the trial court abused its discretion when it denied his motion to strike his prior strike convictions. We disagree.

At the sentencing hearing on this case, defendant moved the court to exercise its discretion pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 [53 Cal.Rptr.2d 789, 917 P.2d 628] (*Romero*) to strike one of his prior strike convictions. After the court examined the relevant law, the parties' briefs, and defendant's records; heard arguments from counsel; and weighed the relevant factors, the court denied the motion. The court noted the need to protect society; the purpose of the three strikes law; defendant's criminal history, which spanned a period of 20 years involving numerous parole and probation violations and state prison terms; the fact that defendant's character had not changed over the last 20 years; and defendant's dim prospect for the future. Based on the relevant factors, the court opined that defendant fell within the spirit of the three strikes law.

■ A trial court's decision to not dismiss or strike a prior serious and/or violent felony conviction allegation under section 1385 is reviewed for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 376 [14 Cal.Rptr.3d 880, 92 P.3d 369].) "In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve the legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' [Citation.] Second, a ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' [Citation.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or

---

[4] We note that public policy also supports the People's position. If a defendant had unlawfully taken a truck with an attached trailer and there were different owners of the truck and the trailer, public policy would mandate that a defendant should be convicted of two counts of unlawfully taking a vehicle. Further, we presume that defendant here would not be challenging his conviction on the second vehicle-taking count if he had unlawfully stolen a tow truck with an attached motor vehicle, or if he had unlawfully taken or driven a big rig truck carrying multiple motor vehicles. Hence, it is obvious that the distinction lies between "vehicle" and "motor vehicle." The Legislature plainly defined "vehicle" as "a device by which any person or property may be propelled, moved, or *drawn* upon a highway . . . ." (Veh. Code, § 670, italics added.)

arbitrary that no reasonable person could agree with it." (*Id.* at pp. 376–377, quoting *People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977–978 [60 Cal.Rptr.2d 93, 928 P.2d 1171], quoting *People v. Superior Court (Du)* (1992) 5 Cal.App.4th 822, 831 [7 Cal.Rptr.2d 177] and *People v. Preyer* (1985) 164 Cal.App.3d 568, 573 [210 Cal.Rptr. 807]; see also *People v. Myers* (1999) 69 Cal.App.4th 305, 309 [81 Cal.Rptr.2d 564].)

■ "In light of this presumption, a trial court will only abuse its discretion in failing to strike a prior felony conviction allegation in limited circumstances. For example, an abuse of discretion occurs where the trial court was not 'aware of its discretion' to dismiss [citation], or where the court considered impermissible factors in declining to dismiss [citation]." (*People v. Carmony, supra,* 33 Cal.4th at p. 378 [14 Cal.Rptr.3d 880, 92 P.3d 369], citing *People v. Langevin* (1984) 155 Cal.App.3d 520, 524 [202 Cal.Rptr. 234] and *People v. Gillispie* (1997) 60 Cal.App.4th 429, 434 [70 Cal.Rptr.2d 462].) Discretion is also abused when the trial court's decision to strike or not to strike a prior is not in conformity with the "spirit" of the law. (*People v. Williams* (1998) 17 Cal.4th 148, 161 [69 Cal.Rptr.2d 917, 948 P.2d 429] (*Williams*); *People v. Myers, supra,* 69 Cal.App.4th at p. 310.)

But "[i]t is not enough to show that reasonable people might disagree about whether to strike one or more of his prior convictions. Where the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance. [Citation.]" (*People v. Myers, supra,* 69 Cal.App.4th at p. 310.) "Because the circumstances must be 'extraordinary . . . by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack' [citation], the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary." (*People v. Carmony, supra,* 33 Cal.4th at p. 378, quoting *People v. Strong* (2001) 87 Cal.App.4th 328, 338 [104 Cal.Rptr.2d 490].)

■ The touchstone of the analysis must be "whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Williams, supra,* 17 Cal.4th 148, 161; see also *People v. Garcia* (1999) 20 Cal.4th 490, 498–499 [85 Cal.Rptr.2d 280, 976 P.2d 831].)

Defendant contends the court should have granted his request to strike his prior strike convictions because (1) the circumstances of his current offenses were neither violent nor serious; (2) he was willing to plead guilty in exchange for a sentence less than 25 years to life; (3) his prior strikes were remote and stemmed from a single case; (4) he had not been convicted of any strike offenses in the interim; and (5) all of his prior offenses were the result of his drug addiction. We cannot conclude the trial court abused its discretion in declining to strike defendant's prior strike convictions.

The relevant considerations supported the trial court's ruling, and there is nothing in the record to show that the court declined to exercise its discretion on improper reasons or that it failed to consider the relevant factors, including defendant's personal and criminal background. In fact, the record clearly shows the court was aware of its discretion, aware of the applicable factors a court must consider in dismissing a prior strike, and appropriately applied the factors as outlined in *Williams*. Defendant has manifested a persistent inability to conform his conduct to the requirements of the law. Defendant's past criminal history was extensive and serious. He began the life of crime in 1982 when he was convicted of being under the influence of a controlled substance (Health & Saf. Code, § 11550). He was sent to county jail for 90 days, but as soon as he was released he committed two counts of robbery (§ 211) with the use of a firearm. He was thereafter sent to state prison for three years with a concurrent violation-of-parole term. In 1985, defendant was arrested of being under the influence of a controlled substance (Health & Saf. Code, § 11350, subd. (a)), convicted of misdemeanor trespass, and sentenced to 34 days in county jail. In August 1988, he was convicted of misdemeanor burglary (§ 459) and placed on 12 months' probation. And in November 1988, he was again arrested for being under the influence of a controlled substance (Health & Saf. Code, § 11377). Thereafter, in 1989, he was convicted of felony theft with a prior (§ 666), placed on 36 months' probation, and ordered to serve 180 days in county jail. In July 1991, he violated probation by committing another petty theft with a prior and was sentenced to 16 months in state prison. In October 1992, he violated probation again and was returned to custody. In 1994, defendant sustained another felony conviction for petty theft with a prior and was sentenced to eight years in state prison. And, soon after his release from prison, defendant committed the instant offenses in September 2002.

Although defendant points out his personal background and the remoteness of his priors, the court could not overlook the fact defendant consistently committed criminal offenses for the past 20 years. His conduct as a whole was a strong indication of unwillingness or inability to comply with the law. It is clear from the record that prior rehabilitative efforts have been unsuccessful for defendant. Indeed, defendant's prospects for the future look no better than the past, in light of defendant's record of prior offense and

reoffense and his underlying drug addiction. There is no indication from the record here that the court failed to consider the relevant factors or that it abused its discretion in determining that, as a flagrant recidivist, defendant was not outside the spirit of the three strikes law. (*Williams, supra,* 17 Cal.4th 148, 161.)

■ Striking a prior serious felony conviction " 'is an extraordinary exercise of discretion, and is very much like setting aside a judgment of conviction after trial.' [Citation.]" (*People v. McGlothin* (1998) 67 Cal.App.4th 468, 474 [79 Cal.Rptr.2d 83].) Accordingly, such action is reserved for "[e]xtraordinary" circumstances. (*People v. Strong* (2001) 87 Cal.App.4th 328, 332 [104 Cal.Rptr.2d 490].) This case, however, is far from extraordinary. Accordingly, given defendant's continuous criminal history, his parole violations, the seriousness of the present and past offenses, his seemingly dim prospects for rehabilitation, and his lack of meaningful crime-free periods, the court did not abuse its discretion in denying the *Romero* motion. The trial court's decision not to strike defendant's priors was neither irrational nor arbitrary.

### C. *Presentence Custody Credits*

At the sentencing hearing, the trial court awarded defendant a total of 359 days of presentence custody credits, consisting of 313 days of credit for time actually served and 59 days of conduct credit. Defendant contends the trial court erred in limiting his presentence custody credits to 15 percent under section 2933.1 because his current convictions were nonviolent. Hence, he claims he is entitled to 110 days of additional credit for time served. The People agree the trial court erred in limiting his presentence conduct credits to 15 percent but argue that, rather than being entitled to more conduct credits under section 4019, defendant is not entitled to any conduct credits because defendant received only an indeterminate term.

■ Essentially, the issue is whether a defendant with a nonviolent third strike, sentenced to an indeterminate term, may receive presentence conduct credits. As explained below, presentence custody credits pursuant to section 4019 are available to a defendant given an indeterminate life term under the three strikes law.

■ Section 4019 is the general statute governing credit for presentence custody. Absent contrary authority, "a defendant receives what are commonly known as conduct credits toward his term of imprisonment for good behavior and willingness to work during time served prior to commencement of sentence. [Citations.]" (*People v. Thomas* (1999) 21 Cal.4th 1122, 1125 [90 Cal.Rptr.2d 642, 988 P.2d 563] (*Thomas*).)

The court in *People v. Williams* (2000) 79 Cal.App.4th 1157 [94 Cal.Rptr.2d 727] awarded presentence custody credit under section 4019 where the defendant received an indeterminate term. (*People v. Williams,* at pp. 1175–1176.) In *People v. Buckhalter* (2001) 26 Cal.4th 20 [108 Cal.Rptr.2d 625, 25 P.3d 1103], our Supreme Court described its decision in *Thomas* as holding that "restrictions on the rights of Three Strikes prisoners to earn term-shortening credits do not apply to confinement in a local facility prior to sentencing. We emphasized that when limiting the credit rights of offenders sentenced thereunder, the Three Strikes law (§§ 667, subd. (c)(5), 1170.12, subd. (a)(5)) expressly refers only to 'postsentence . . . credits,' i.e., those ' "awarded pursuant to [a]rticle 2.5" ' [citation] and 'does not address presentence . . . credits' for Three Strikes defendants [citation]." (*Buckhalter,* at p. 32, quoting *Thomas,* 21 Cal.4th at p. 1125, italics omitted.)

Several other cases decided by the California Supreme Court have also discussed various types of conduct credits. *In re Cervera* (2001) 24 Cal.4th 1073 [103 Cal.Rptr.2d 762, 16 P.3d 176] discussed prison conduct credits (not the presentence credits at issue in the case at bench) and held that a defendant sentenced to an indeterminate life term under the three strikes law was not entitled to *prison conduct credits* for use against his or her mandatory *indeterminate* term of life imprisonment. (*Id.* at pp. 1076, 1080.) As defendant points out, however, *Cervera* only applies to postconviction custody credits.

 Based on the foregoing, presentence conduct credits are available to a defendant sentenced to an indeterminate life term under the three strikes law. Furthermore, as both parties agree, because defendant's current felonies are not violent felonies listed in section 667.5, his presentence custody credits are not limited under section 2933.1 to 15 percent of actual time. (*Thomas, supra,* 21 Cal.4th at pp. 1127–1130; *People v. Williams, supra,* 79 Cal.App.4th at pp. 1175–1176; *People v. Henson* (1997) 57 Cal.App.4th 1380, 1381, 1389 [67 Cal.Rptr.2d 734].)

 Presentence custody credit is calculated under section 4019 " 'by dividing the number of days spent in custody by four and rounding down to the nearest whole number. This number is then multiplied by two and the total added to the original number of days spent in custody. [Citation.]' [Citation.]" (*People v. Williams, supra,* 79 Cal.App.4th at p. 1176, fn. 14.) Defendant spent 313 days in actual custody. That number, divided by four and rounded down to the nearest whole number, equals 78; 78 multiplied by two equals 156 days of conduct credit. Thus, defendant should have received a total of 469 days of presentence credit (313 actual, plus 156 days of conduct credit). Presentence conduct credits may not be used, however, to reduce either a minimum term of 25 years or a maximum term of life.

(*People v. Carpenter* (1979) 99 Cal.App.3d 527, 535-536; § 3046.)[5] Accordingly, we conclude that after defendant has served the minimum term, the Board of Prison Terms may use defendant's section 4019 credits in determining defendant's release date. (*Carpenter*, at pp. 535-536.)

Thus, even if defendant's sentence is solely an indeterminate term, he is entitled to an award of section 4019 conduct credits. The abstract of judgment should therefore be modified accordingly.

## III

## DISPOSITION

The judgment is modified to reflect that defendant has 469 days of presentence credits, consisting of 313 days in actual custody and 156 days in conduct credits. The trial court is directed to prepare an amended abstract of judgment and to forward a certified copy to the Department of Corrections. In all other respects, the judgment is affirmed.

Ramirez, P. J., and King, J., concurred.

A petition for a rehearing was denied October 27, 2004, and on September 27, 2004, and October 27, 2004, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied December 1, 2004.

---

[5] Section 3046 states in pertinent part: "(a) No prisoner imprisoned under a life sentence may be paroled until he or she has served the greater of the following: [¶] (1) A term of at least seven calendar years. [¶] (2) A term as established pursuant to any other provision of law that establishes a minimum term or minimum period of confinement under a life sentence before eligibility for parole."