Filed 4/30/15  P. v. Underwood CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CARLUS ANTHONY UNDERWOOD,<br><br>    Defendant and Appellant. | H040312<br>(Santa Clara County<br>Super. Ct. No. C1079816) |

Defendant Carlus Anthony Underwood pleaded no contest to four counts of second degree robbery (Pen. Code, §§ 211, 212.5, subd. (c))[1] and three counts of felony false imprisonment (§§ 236, 237) arising out of his active participation in the armed robbery of a marijuana collective.  After the trial court denied his *Romero*[2] motion, he was sentenced to a total term of 36 years to life and ordered to pay various fines and fees.

On appeal, Underwood contends the trial court abused its discretion in denying his *Romero* motion and should have stricken at least two of his strike priors.  Underwood also argues that the penalty assessments imposed in connection with one of his fines, specifically the fine imposed pursuant to section 1202.5, subdivision (a), were improperly calculated and must be reduced.

---

[1] Further unspecified statutory references are to the Penal Code.

[2] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

We disagree that there was any abuse of discretion in denying the *Romero* motion. However, as the People have conceded, the penalty assessments were miscalculated and must be modified.

As so modified, we will affirm the judgment.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In May 2010, Underwood drove from Yuma, Arizona, to San Jose, California, along with three others, Angel Torres, Mauro Sierra and Robert Singleton. They traveled in Singleton's silver Honda and planned on buying a car from Torres' father in San Jose.

During the drive, Torres suggested they rob a cannabis club in San Jose and, after discussing the matter further, the men agreed to do so. Torres indicated he did not want to use firearms in the robbery but Underwood said they should.

Underwood and his companions arrived in San Jose on May 18, 2010. Although their initial plan was to rob the cannabis club on the day they arrived, they decided to postpone the robbery. Torres' father traded a blue Honda to them in exchange for Singleton's silver Honda plus some cash. Torres' brother-in-law was visiting and overheard Underwood planning the robbery with Torres, Sierra and Singleton.

Torres borrowed a shotgun from a friend. The barrel was sawed off and there were bullet shells taped to the side of the shotgun. It was wrapped in a sheet or a towel. Torres and Singleton went to the cannabis club in order to determine its location as well as the layout of the building. They also purchased pepper spray, a pellet gun and duffel bags to use in the robbery.

On May 20, 2010, Torres arranged to borrow his cousin's black Nissan Altima. They met in a parking lot and Torres arrived in a blue Honda, along with Underwood, Sierra and Singleton. Torres' cousin gave him the keys to her car and arranged to meet him later that day.

2

Singleton drove to the cannabis club in the borrowed Nissan. When they arrived, Underwood, Singleton and Sierra walked toward the building. Underwood carried the pellet gun, while Singleton carried the shotgun. Torres remained behind as the lookout.

Sierra rang the doorbell around 12:30 p.m. At the time, there were nine people inside the business: three employees, a doctor, a doctor's assistant and four customers. Gordon Seifert was working security at the club that day, and as part of his duties, he would answer the door and confirm that customers had marijuana recommendations before allowing them inside.

Seifert looked through the peephole when Sierra rang the doorbell and saw Underwood and two other men standing outside. He opened the door and Underwood began asking him some "really strange questions," including directions to another office and what business was conducted at Seifert's facility. Seifert said he did not know what other office Underwood was asking about and said "well, we have a medical marijuana facility here."

Underwood pulled a gun out of his waistband, stuck it in Seifert's stomach and told him to "get the fuck on the floor." Seifert backed up a few steps and kneeled down. Underwood followed him and put the gun to Seifert's head, telling him to get down on the floor. Seifert just looked at Underwood, "because I wasn't about to let him shoot me in the back of the head."

Underwood went over to the door that led into the lobby. He opened it slightly and looked inside, seeing that there were other people in the next room. Underwood closed the door again then kicked it open "like a tough guy." The door split and swung open. Meanwhile, two other men entered the front door and Seifert saw they were carrying guns as well. One of those men pointed his gun at Seifert's head and told him to lie down, but Seifert did not comply. All three men walked past him and entered the interior lobby.

3

Amber Kamber, Aaron McCall and Troy Moss were inside the lobby. After Underwood kicked the door open, Sierra walked in carrying the sawed-off shotgun with shells taped to the handle and a razor blade taped to the end of the barrel. He told Kamber, McCall and Moss to "get the fuck on the ground or I'll start killing people." Sierra pointed the shotgun at their heads and announced "You guys are fucked now. You are selling shit in my hood."

Dr. Kevin Noonan was in the office with customer Steven Pajuelo when Underwood and the others entered. Sierra grabbed Dr. Noonan, pulled him across the desk and into the lobby where he threw him to the floor. Sierra then grabbed Pajuelo and threw him to the floor of the lobby as well. One of the men punched and kicked Dr. Noonan in the back of the head.

One of the three went back and got Seifert, throwing him into the lobby with the other victims. Someone again pointed a gun to Seifert's head and told him to "lay [*sic*] down all the way and put your head down." Seifert saw five or six other patients, along with all of his employees, lying on the floor of the lobby.

The men yelled at everyone to stay on the floor but give them their wallets and jewelry. One of the men walked up to each person lying on the ground, put a gun to their head and said "give me your wallet, give me whatever you have, give me your watch." The victims all complied. McCall gave them his personal identification, driver's license, social security card and $600. Dr. Noonan gave them his wallet, which contained approximately $500.

The men then started asking where the safe was. Andrew Spector, who had been working behind the lobby desk, told them there was no safe, but Sierra called him a liar. Sierra said he knew there was a safe and he would kill Spector if he did not tell them where the safe was. Spector repeatedly denied that there was a safe on the premises.

Underwood and Singleton went to the back dispensary where the marijuana was stored. They gave a black duffel bag to Sean Lockwood, who was working in the

4

dispensary and told him to fill it with the jars of marijuana. After Lockwood filled the bag as ordered, he lay down on the floor. In all, the men made off with seven to eight pounds of marijuana, with a street value of $50,000.

Underwood grabbed a cash register and began to carry it toward the front door, where he placed it on the ground. He put his hands in his coat pockets and tried to open the door, apparently to avoid leaving fingerprints. Underwood was unable to do so, and Singleton told him to leave the register where it was. Underwood did so. When someone outside yelled and honked a horn, Underwood and the others ran out and drove off quickly.

Torres arranged to meet his cousin to return her car, but when she arrived, Torres was driving a blue Honda. He told her he would get her Nissan back to her soon. They picked up his cousin's daughter and drove south on Highway 101. They exited in Morgan Hill and drove to a gas station where she saw her car, along with the three men Torres was with earlier that day. Torres parked next to her car and the men transferred a black bag out of the trunk of the Nissan into the Honda's trunk. Torres' cousin got out of the Honda and, at some point, noticed one of the men carrying a gun wrapped in a white shirt. When she got back into her own car, she noticed it smelled like marijuana.

Underwood and the other men got back into the blue Honda and drove back to Arizona. They discarded the pellet gun somewhere along Interstate 5 and eventually split the marijuana four ways.

In the course of investigating the robbery, police obtained the license number of the Nissan, which led them to Torres' cousin. Upon searching the Nissan, police found a sawed-off shotgun with shells taped to the handle, wrapped in a white shirt.

Underwood was charged by information with six counts of second degree robbery (§§ 211, 212.5, subd. (c), counts 1-6) and three counts of felony false imprisonment (§§ 236, 237, counts 7-9). The information further alleged that Underwood was armed with a firearm during the commission of each of the offenses (§ 12022, subd. (a)(1)), had two

5

prior serious felony convictions (§ 667, subd. (a)), three prior strike convictions (§§ 667, subds. (b)-(i), 1170.12) and two prison priors (§ 667.5, subd. (b)). The information was subsequently amended, dropping two of the robbery charges and renumbering the remaining counts.

Prior to jury selection, the prosecutor notified the court and defense counsel that he had recently discovered that fingerprint evidence taken from the cash register had not been examined. When those fingerprints were analyzed, one of the prints was found to match Underwood's. After defense counsel objected, the trial court found disclosure of the evidence had not been intentionally delayed and refused to exclude it. Defense counsel was given a brief extension of the trial date to discuss the matter with Underwood and consult experts, but after a brief recess, Underwood instead opted to plead no contest to all charges and admit all of the enhancements, strikes and prior convictions. The prosecution dismissed Underwood's two prison priors because they were washed out under section 667.5, subdivision (b).

At his September 27, 2013 sentencing, the trial court denied Underwood's *Romero* motion and sentenced him to a term of 25 years to life on count 1 (second degree robbery) plus 10 years for his two prior serious felony convictions and one year for the arming enhancement, for a total term of 36 years to life. The trial court also imposed identical, but concurrent, 36 years to life sentences on the remaining three robbery charges (counts 2-4), plus three additional concurrent 25 years to life, plus one year for the arming enhancement, on each of the false imprisonment charges (counts 5-7). Underwood was further ordered to pay restitution along with various other fees and fines including a "$10 fine plus penalty assessment pursuant to [section] 1202.5." The minute order and abstract of judgment reflect the amount of the penalty assessment associated with this particular fine to be $31.

After obtaining a certificate of probable cause, Underwood timely appealed.

6

## II. DISCUSSION

### A. *Denial of* Romero *motion*

Underwood argues the trial court abused its discretion in denying his *Romero* motion because the prior strike offenses were remote in time and, even though he engaged in criminal activity during the interim period, he had remained free of criminal activity long enough to wash out his prison priors. Also, two of the strikes were committed during a single incident in which Underwood stole a Christmas tree, and the other strike offense was committed within two months of that theft. Underwood served a single prison term for all of those offenses. His non-strike criminal activity was limited to nonviolent misdemeanors including two drug-related convictions.

#### 1. *Background*

As part of his plea agreement, Underwood admitted having suffered three strike prior convictions: attempted robbery (§§ 211, 664) and dissuading a witness by force or threat (§ 136.1, subd. (c)(1)), both on December 5, 1990; and robbery (§ 211), on February 2, 1991. In the 1990 incident, Underwood stole a Christmas tree from a market, and then punched and threatened the security guard who apprehended him. In the 1991 incident, Underwood, his brother and another accomplice went on an "assault spree" at a shopping mall in San Diego County. They attacked six different people without provocation. Underwood's brother punched one of the victims so hard, the victim lost consciousness. Underwood "jumped on another victim's back, struck him in the head, and ripped a necklace from his neck." When apprehended, Underwood and the others said words to the effect of "Don't fu[ck] with the Crips."

In the probation report, the probation officer stated he "was unable to identify [any] factors in mitigation." In addition to his seven current felonies, Underwood's criminal record included four felony and 13 misdemeanor convictions, many of which were violent. He had violated parole twice and escaped from prison once. Less than a

year before committing the present offenses, he was convicted of two counts of domestic violence, sentenced to six months in jail, and placed on three years of probation.

In his *Romero* motion, Underwood asked the court to dismiss his prior strikes because: (1) they were remote in time, having occurred more than 20 years ago; (2) he was not charged with or convicted of any serious or violent felonies during that intervening period; (3) two of the strike offenses arose out of a single incident of theft, whereas the third was committed within a couple of months of that; and (4) he is 41 years old, has a strong relationship with his family and is willing to participate in rehabilitative programs.

The trial court denied Underwood's motion, stating: "[T]he Court has . . . reviewed this case many times because this case has been before this Court previously. I have had an opportunity to take into consideration the factors that the Court must look to in terms of guidance in determining whether or not this case falls outside the scope of the three-strikes legislation. [¶] In examining Mr. Underwood's present felonies and the prior felonies, and the background and character and his prospects, based on the seriousness of the offenses and based on Mr. Underwood's lengthy criminal history, the Court does not find that this case falls outside of the three-strikes law, so the request to strike the prior is denied at this time."

### 2. *Standard of review*

Under section 1385, subdivision (a), a judge "may, either of his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed." *Romero* held that "a trial court may strike or vacate an allegation or finding under the Three Strikes law that a defendant has previously been convicted of a serious and/or violent felony, on its own motion, 'in furtherance of justice' pursuant to . . . section 1385[, subdivision] (a)." (*People v. Williams* (1998) 17 Cal.4th 148, 158 (*Williams*).) When a trial court considers a motion under *Romero*, it "must consider whether, in light of the nature and circumstances of his present felonies and prior serious

8

and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the [spirit of the three strikes law] scheme[] . . . in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Id*. at p. 161.)

A defendant has the right to seek review of a trial court's decision not to strike a prior conviction. (*People v. Carmony* (2004) 33 Cal.4th 367, 376 (*Carmony*).) The trial court's decision is reviewed under the abuse of discretion standard, and the burden on defendant is to show that the court's decision was " ' "irrational or arbitrary." ' " (*Ibid*.) In reviewing a ruling on a *Romero* motion, the court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Williams*, *supra*, 17 Cal.4th at p. 161.) "[A]n appellant who seeks reversal must demonstrate that the trial court's decision was irrational or arbitrary. It is not enough to show that reasonable people might disagree about whether to strike one or more of his prior convictions. Where the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance." (*People v. Myers* (1999) 69 Cal.App.4th 305, 309-310.)

The Three Strikes law "establishes a sentencing requirement to be applied in every case where the defendant has at least one qualifying strike" unless the trial court deems the defendant falls outside the three strikes scheme. (*People v. Strong* (2001) 87 Cal.App.4th 328, 337.) Only under "extraordinary" circumstances can a trial court find a defendant "fall[s] outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack." (*Id*. at p. 338.)

9

It is true that a trial court errs if it fails to appreciate the scope of its discretion and therefore fails to exercise it. (*Carmony*, *supra*, 33 Cal.4th at p. 378.) However, reviewing courts will not infer sentencing error if the record does not affirmatively show it. (*Ibid*.) In this context--where a defendant seeks to establish the negative proposition that the trial court did not consider what it was required to consider--a defendant can rarely meet the burden to affirmatively demonstrate error because the trial court is not required to state reasons for declining to strike a strike prior. (*People v. Gillispie* (1997) 60 Cal.App.4th 429, 433.) In other words, where the Legislature establishes a sentencing norm and requires the trial court to explicitly justify a departure therefrom, all that is required on the appellate record is a showing that the trial court was aware of its discretion to select an alternative disposition. (*Id*. at p. 434.)

### 3. Analysis

Here, the record shows that the trial court was aware of its sentencing options. Underwood filed a written motion, the People responded, and the parties argued their positions. Moreover, the trial court was well aware that Underwood faced a lengthy sentence, and had a period in his life when he committed no serious and violent felonies. The trial court was unquestionably aware of its discretion under *Romero*, namely to balance the nature and circumstances of Underwood's present felonies, his prior convictions, as well as his background, character, and prospects to determine whether Underwood could be deemed outside the spirit of the Three Strikes law.

In this case, the trial court properly exercised its discretion in declining to dismiss any of Underwood's prior strikes. The nature of Underwood's prior and current offenses did not warrant a finding that he was outside "the spirit of the Three Strikes law." (*Williams*, *supra*, 17 Cal.4th at pp. 162-163.) Underwood pleaded no contest to all of the charged offenses and admitted that he was armed with a firearm during their commission. When planning the robbery, Underwood was the one who insisted that the group be armed, and he was the first one to hold a gun to a victim's head when he forced his way

10

inside the marijuana dispensary. During the crime, Underwood and his accomplices repeatedly held guns to their victims' heads at close range, forcing them to the ground, before taking their property.

His strike offenses, though committed more than 20 years prior, were also violent, unprovoked and involved theft. In the interim, Underwood has not led a blame-free life; rather he accumulated a number of misdemeanor convictions for a variety of offenses, some drug-related, but others involved domestic violence, and even resisting arrest. Thus, a large amount of Underwood's adult life following his strike convictions has been spent incarcerated, on parole, on probation or under community supervision. As in *Williams*, *supra*, 17 Cal.4th at page 163, in the years following his strike convictions Underwood "did not refrain from criminal activity . . . and he did not add maturity to age. Quite the contrary. In those years, he was often in prison or jail; when he was not, he violated parole and . . . probation." (See *People v. Philpot* (2004) 122 Cal.App.4th 893, 906-907 [court properly concluded that defendant, as a "flagrant recidivist," was not outside the spirit of the Three Strikes law, based on defendant's 20-year history of criminal activity, his underlying drug addiction, and the prior and current offense as indicative of his poor prospects].)

The trial court noted that it considered "the factors that the Court must look to in terms of guidance in determining whether or not this case falls outside the scope of the three-strikes legislation, . . . [including] Underwood's present felonies and the prior felonies, and the background and character and his prospects." The trial court concluded, "based on the seriousness of the offenses and based on . . . Underwood's lengthy criminal history, the Court does not find that this case falls outside of the three-strikes law."

Because we can find no failure to exercise the court's sentencing discretion; no " ' "arbitrary, capricious, or patently absurd" ' " " (*Carmony*, *supra*, 33 Cal.4th at p. 378) exercise of that discretion; and no "extraordinary circumstances" compelling a dismissal of Underwood's strikes under section 1385, the court's determination of the *Romero*

11

motion was not "so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, *supra*, at p. 377.)

  B.  *Penalty assessments*

  At sentencing, the trial court ordered Underwood to pay a "$10 fine plus penalty assessments pursuant to [section] 1202.5 of the Penal Code." A penalty assessment of $31 was subsequently entered on the September 27, 2013 minute order as well as the abstract of judgment.

  Underwood argues the $31 penalty assessment was erroneously calculated under amended versions of the statutes in effect at the time of his sentencing, rather than the versions in effect at the time of his offenses. The prior versions of the statute imposed lesser penalties and thus calculating the penalty assessments under the amended statutes is a prohibited ex post facto punishment. The People concede this error and we agree the concession is appropriate.

  A defendant convicted of robbery (§ 211) must pay a $10 fine in addition to any other penalty or fine assessment. (§ 1202.5, subd. (a).) In *People v. Voit* (2011) 200 Cal.App.4th 1353 (*Voit*), we identified seven assessments, surcharges, and penalties attendant to an underlying fine, as follows: "(1) a 100 percent state penalty assessment (§ 1464, subd. (a)(1)), (2) a 20 percent state surcharge (§ 1465.7), (3) a 30 percent state courthouse construction penalty (Gov. Code, § 70372), (4) a 70 percent additional penalty (Gov. Code, § 76000, subd. (a)(1)), (5) a 20 percent additional penalty if authorized by the county board of supervisors for emergency medical services (Gov. Code, § 76000.5, subd. (a)(1)), (6) a 10 percent additional penalty ' "[F]or the purpose of implementing the DNA Fingerprint, Unsolved Crime and Innocence Protection Act" ' (Gov. Code, § 76104.6, subd. (a)(1)), and (7) a 10 percent additional state-only penalty to finance Department of Justice forensic laboratories (Gov. Code, § 76104.7)." (*Id.* at pp. 1373-1374, fn. omitted; see *People v. Sharret* (2011) 191 Cal.App.4th 859, 863-864.)

Courts must impose the penalty assessments in effect at the time of a defendant's crime in order to avoid unconstitutional ex post facto expansion of punishment. (*Voit*, *supra*, 200 Cal.App.4th at p. 1375.) An ex post facto penalty is an unauthorized sentence that can be raised for the first time on appeal. (See *In re Sheena K.* (2007) 40 Cal.4th 875, 886; *People v. Valenzuela* (2009) 172 Cal.App.4th 1246, 1248-1249.)

Here, it appears that the court arrived at $31 by adding: (1) $10 (100 percent of $10, pursuant to § 1464, subd. (a)(l)); (2) $2 (20 percent of $10, pursuant to § 1465.7); (3) $5 (50 percent of $10, pursuant to Gov. Code, § 70372); (4) $7 (70 percent of $10, pursuant to *id.*, § 76000, subd. (a)(l)); (5) $2 (20 percent of $10, pursuant to *id.*, § 76000.5, subd. (a)(1)); (6) $1 (10 percent of $10, pursuant to *id.*, § 76104.6, subd. (a)(1)); and (7) $4 (40 percent of $10, pursuant to *id.*, § 76104.7).

However, two of the above statutes imposed lesser penalties on May 20, 2010, the date on which Underwood committed the robbery. The state-only penalty to finance Department of Justice forensic laboratories (Gov. Code, § 76104.7) was increased from 10 percent to 30 percent effective June 10, 2010 (Stats. 2009-2010, 8th Ex. Sess., ch. 3, § 1), and again to 40 percent effective June 27, 2012 (Stats. 2012, ch. 32, § 25). Thus, Underwood was subject to a 10 percent, not a 40 percent, assessment under that statute.

In addition, the state courthouse construction penalty was incorrectly calculated. On May 20, 2010, Government Code section 70372 provided: "Except as otherwise provided in subdivision (b) of Section 70375," the state court construction penalty was 50 percent (former Gov. Code, § 70372, subd. (a)(1); Stats. 2009-2010, 2nd Ex. Sess., ch. 10, § 5, eff. May 21, 2009; Stats. 2010, ch. 720, § 16, eff. Oct. 19, 2010), but that percentage was subject to reduction by a county "as provided in subdivision (b) of Section 70375." (Former Gov. Code, § 70372, subd. (a)(2); Stats. 2009-2010, 2nd Ex. Sess., ch. 10, § 5; Stats. 2010, ch. 720, § 16, eff. Oct. 19, 2010.)

In *People v. McCoy* (2007) 156 Cal.App.4th 1246 (*McCoy*), the court explained that for a period of time Government Code section 70375, subdivision (b) authorized two

potential reductions in the 50 percent state court construction penalty, one in the amount collected for deposit into a local courthouse construction fund pursuant to Government Code section 76100, and the other in the amount collected for the "Transitional State Court Facilities Construction Fund" to the extent it is funded by the local courthouse construction fund. (*McCoy*, *supra*, at pp. 1252-1253; Stats. 2002, ch. 1082, § 4; Stats. 2003, ch. 592, § 18.) By reference to a chart included in Government Code section 76000, subdivision (e) that reflected the amounts various counties were collecting for local courthouse construction, *McCoy* concluded that Los Angeles County had, by virtue of its local courthouse collections, effectively reduced the 50 percent maximum to a 30 percent penalty assessment for state courthouse construction. (*McCoy*, *supra*, at p. 1254.)

Following the reasoning of *McCoy*, we note that the versions of Government Code section 76000, subdivision (e) applicable on May 20, 2010, when Underwood committed his crimes, reflect that Santa Clara County was collecting $1.50 from the $7 penalty in Government Code section 76000 for local courthouse construction. (Current and former Gov. Code, § 76000; Stats. 2008, ch. 218 § 5.) In other words, the state court construction fee of $5 per $10 fine was reduced to $3.50, or 35 percent, at that time.

Following *People v. High* (2004) 119 Cal.App.4th 1192, which held that punitive fund raising measures cannot be applied retroactively (*id*. at pp. 1197-1199), we apply the statutes in effect at the time of Underwood's crimes in order to avoid an ex post facto expansion of his punishment. According to our calculation, the total amount of penalty assessments that can be appended to Underwood's $10 fine is $26.50, consisting of a 100 percent penalty ($10) under section 1464, subdivision (a), a 20 percent penalty ($2) under section 1465.7, a 35 percent penalty ($3.50) under Government Code section 70372, a 70 percent penalty ($7) under Government Code section 76000, subdivision (a)(1), a 20 percent penalty ($2) under Government Code section 76000.5, subdivision (a)(1), a 10 percent penalty ($1) under Government Code section 76104.6, subdivision (a)(1), and a

10 percent penalty ($1) under former Government Code section 76104.7.  We will modify the judgment accordingly.

## III.  DISPOSITION

The judgment is modified to impose a $10 fine, plus penalty assessments of $26.50, under Penal Code section 1202.5, subdivision (a).  As so modified, the judgment is affirmed.  The clerk of the court is directed to prepare an amended abstract of judgment and forward a certified copy of the same to the Department of Corrections and Rehabilitation.

_____
                                    Premo, J.

WE CONCUR:


_____
          Rushing, P.J.


_____
          Elia, J.