Filed 8/16/16  P. v. Baylock CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C079095 |
| Plaintiff and Respondent, | (Super. Ct. No. 14F05225) |
| v. | |
| MICHAEL WAYNE BLAYLOCK, | |
| Defendant and Appellant. | |

A jury found defendant Michael Wayne Blaylock guilty of assault with a deadly weapon and battery resulting in great bodily injury.  On appeal, defendant contends the evidence showed he acted in self-defense and the evidence was therefore insufficient to support the convictions.  He further contends the trial court erred in denying his *Romero*[1] motion to strike his prior conviction for manslaughter.  We affirm.

---

[1]     *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

FACTUAL BACKGROUND

In 2013, Zachary Southwick moved into a home (a quadplex) on Savannah Lane with his then-girlfriend (now his wife) Ricarda Criger and their two children. Criger's roommate, Teresa Clarke, lived in the home as well. At the time, Clarke was dating defendant, who would occasionally come to the home and spend the night.

Shortly after Southwick moved in, he awoke to the sound of Clarke screaming for help. Southwick found defendant beating Clarke with a backpack. Southwick took the backpack from defendant and kicked him out. Thereafter, defendant was not permitted to stay at the home.

Nevertheless, defendant showed up at the home every few days to speak with Clarke, who agreed to speak with him on some occasions, but not others. At times, defendant would "spy" on Clarke by looking through cracks in the back fence. Southwick tried nicely asking defendant to leave. At first, defendant responded by asking Southwick to tell Clarke he loved her and he was sorry as he left the property. Eventually, though, Southwick had to tell defendant he could not come around so often. Despite Southwick repeatedly telling defendant to "please not come around," defendant continued to visit the home looking for Clarke even after Clarke moved out. This upset Southwick and caused Criger to be afraid.

On April 21, 2014, Southwick saw defendant sitting on an electrical power box just outside the front door. Southwick opened the front door and told him to leave. Defendant seemed upset, mumbled something, and left. Southwick walked over to where defendant had been sitting and found a syringe lying there. Shortly thereafter, Southwick reported the event to one of the security guards patrolling the complex and gave him the syringe.

Later that evening, Southwick was upstairs in a bedroom when he heard someone yelling from the carport behind his house, "Come out before I shoot up your house." He looked out the window and saw defendant with one of his hands in his waistband.

Believing defendant had a gun, Southwick went out the front door intending to sneak up on defendant and disarm him. However, when Southwick rounded the building, he saw a man named Antonio sitting on a bicycle. Antonio yelled to defendant, "He's out front, nigger."

Defendant came around the brick wall. He had one hand in his waistband and was screaming something like, "I'm going to smoke you." Southwick tried to position himself behind a tree. Defendant approached and came within six feet of Southwick, who lunged at defendant without making contact, trying to prevent defendant from pulling whatever weapon he had out of his waistband. About that time, Antonio approached Southwick from behind. Southwick turned his body so he could keep track of both men. Defendant reached into his pocket, pulled something out, and put his hand behind his back. As Southwick kept moving away from Antonio, he saw defendant had a knife in his hand. Defendant stabbed Southwick and said, "You're going to fucking die" or "I'm going to fucking kill you," then lunged at Southwick three more times. Southwick grabbed defendant's wrist and pulled the blade out, yelling, "[D]id you just fucking stab me." As Southwick put pressure on the wound, he defended himself from defendant who continued lunging and trying to stab him. Eventually, defendant and Antonio got on their bicycles and rode away.

At the hospital, Southwick told Sacramento Police Officer Tim McMahan that someone named Money Mike stabbed him. Southwick said he saw Money Mike outside his home earlier and told him to leave. Money Mike left, but returned later with another person. When Southwick went outside and told them to leave, Money Mike lunged at him. Southwick felt like he had been "slapped" on the back but, when he touched the area, he saw that his hand was covered in blood. Money Mike kept lunging at him with the knife. Southwick tried to slap Money Mike's hand in an effort to knock the knife away. Finally, several neighbors came out and started yelling, and Money Mike and the other man rode off on their bicycles.

At trial, Criger testified that, after Southwick kicked defendant out, she saw defendant regularly selling drugs or using drugs outside the home. She called complex security 20 to 30 times to report defendant's conduct. The night of the stabbing, she was putting her children to bed when she heard yelling coming from outside. Southwick went outside and Criger followed behind in her wheelchair. Defendant and Antonio were riding around on their bicycles and yelling, "One-on-one fight, no weapons, nothing." Southwick approached defendant, who had his hands in his pants. Southwick put his hands up in the air and said, "I thought this was a one-on-one fight. What you got in your pants? I don't got nothing on me." Defendant pulled his hands and attempted to "hit" Southwick, and Southwick grabbed defendant's hands. Then Southwick walked back towards Criger and said, "You just stabbed me, mother fucker." Criger yelled for someone to call 911. Defendant and Antonio got on their bikes and left, and Criger called 911.

On July 29, 2014, three months after the stabbing, Sacramento Police Officers Michael Cooper and John Pullen were on patrol when they spotted defendant on a bicycle. Knowing defendant had several outstanding warrants, the officers stopped him, searched him, and placed him under arrest. Defendant had two knives in his backpack. While discussing his outstanding warrants, defendant told Officer Pullen he used to live with someone named Zach who had taken items from his room. Defendant and Zach had argued about the theft. Defendant told Pullen that, on one occasion, Zach "had come at him with a firearm and that he had defended himself by . . . sticking Zach with the knife." Defendant said he did not call the police because he had an active warrant.

Detective Mike Mullaly interviewed defendant the following day. Defendant gave inconsistent stories throughout the interview. He first told Mullaly he had an ongoing dispute with Southwick and, on the day of the stabbing, Southwick approached him with a gun, which he described in detail. He also said several times that he was by himself

4

during the confrontation, and denied that someone named Antoine[2] was there. He repeated this version of events several times, and even acted it out for Mullaly. Defendant repeatedly denied having used drugs prior to the incident.

Later in the interview, when Detective Mullaly confronted defendant about inconsistencies in his story, defendant admitted he lied about Southwick having a gun and about being by himself during the confrontation. He told Mullaly he got into a verbal argument with Southwick and left, but returned with his friend, Antoine, to fight Southwick. He yelled at Southwick, who was in the house, to come out and fight. Southwick came out of the house with no weapons. He approached defendant with his hands up and defendant stabbed him. Defendant told Mullaly he did it because "Southwick was younger than him, and he was worried that he was going to get beat up" by Southwick.

At trial, defendant testified he lived at Criger's home with Clarke for approximately six months. At some point, Southwick moved back in with Criger. A couple of weeks later, defendant moved out and into the home of his aunt, Sheryl Carrington, who lived in the same complex. Over time, his interactions with Southwick became "unpleasant." Southwick tried to prevent him from coming anywhere near the home. Defendant testified, "Anytime he seen me coming down the street, either he was running up on me with a pistol or baseball bat, knives, poles. Matter of fact, he threw a couple bricks at me a couple times. Just every time he used to see me coming up and down the street, no matter where he was at, he could be in a car driving -- going down the street, he would literally jump out the car and come after me, you know. You know, there was a time I wouldn't go to my aunt's house because -- you know what I'm saying

---

[2]     It appears from the record that Antoine is the same person Southwick and Criger both referred to as Antonio. We use those names interchangeably to identify the same individual who was with defendant at the time of the stabbing.

-- because I didn't feel like --." Defendant testified that Southwick told him he was "not allowed to come around there," called him a "nigger," and said, "I'm going to fuck you up when I see you." Southwick pulled a gun on him five or six times. The first time, Southwick pointed a .38-caliber revolver at him and his cousin. The second time, Southwick stood inside the house and pointed a rifle at him through the window. The third time, defendant was riding his bike when Southwick pointed a gun from his truck and said, "Get the fuck over here." The fourth time, defendant had just left his aunt's house when Southwick, who was drinking with some friends in the carport, ran down the walkway with a pistol and said, "Didn't I tell you to quit coming and fuck around here."

Defendant further testified Southwick had a baseball bat and a pole that he used to threaten defendant with. On one occasion, defendant was walking up the street towards his aunt's house when Southwick confronted him with a knife and said, "What is you doing over here, mother fucker." The day of the stabbing, defendant had an argument with Southwick, who told defendant, "Bitch, didn't I tell you not to come back down the street?" They argued for a bit and then defendant went to Antoine's house for awhile. He asked Antoine to go with him back to his aunt's house "to make sure that everything was cool." They rode their bikes toward his aunt's house, but Southwick came out of his house and walked toward defendant saying, "I'm going to fuck you up. I'm going to kick your ass." Defendant, who was carrying a pocketknife he always carries, said, "Man, just get away from me. I don't want -- I don't want to be bothered with you." As Southwick approached him and took a fighting stance, defendant opened the knife. Southwick lunged at him and grabbed his hands. Defendant "swung" the knife and "poked" Southwick, who said, "Is that all you got?" "Oh, you fucking stabbed me." Defendant got on his bike and rode off. Antoine, who had been watching from the carport, laughed as though the whole thing was a joke.

Defendant denied ever calling Southwick out, threatening to shoot up his house, or trying to stab him more than once. He explained that he lied to Detective Mullaly about

6

being there alone because Antoine "came to do a favor for me" and "[h]e didn't have nothing to do with it, and I didn't feel no reason to bring him into my situation with [Southwick]."

Defendant testified he thought Southwick was going to kill him and he assumed Southwick had a weapon because "[a]ny other time he came after me, he had a weapon on him." He testified that Southwick had his hands behind his back when he approached him and said, "I'm going to kill you nigger," and put his hands in the air. Defendant confirmed having told Detective Mullaly that he intended to go fight Southwick that day, but testified he knew Southwick was going to come after him and said, "I was going to stand my ground this time."

Defendant further testified he "had been up for four days" and was tired and just wanted to get to his aunt's house to sleep. He admitted he had been up for four days because he was "on methamphetamine" and was homeless at the time, but denied selling or using drugs around Southwick's home. He also admitted he lied to Detective Mullaly when he said he had not used drugs prior to the incident.

Defendant admitted he lied to Officer Pullen and Detective Mullaly when he said Southwick had a gun. Defendant pulled the knife out of his pocket when Southwick was approximately 22 feet away from him. He testified that Southwick, who was unarmed, saw him pull out the knife but continued to walk toward him anyway. When Southwick got to within 20 feet of defendant, Southwick "threw his hands in the air" and said, "I'm going to fuck you up." "I'm going to kill you." When Southwick got within six or seven feet of defendant, Southwick made his hands into fists and "got in a fighting stance, like he was getting ready to hit me." That is when defendant stabbed Southwick. Defendant said he did not call the police after the stabbing because "you don't call the police over there . . . [y]ou labeled as a snitch." Also, he was on probation at the time and "had some probation violations," and "I just couldn't go to jail right now."

7

Michelle Williams testified that in November 2012, she witnessed an incident between defendant and Southwick. She had gotten a ride with Southwick and Criger in Southwick's truck. Defendant was riding his bike on Savannah Lane. Southwick pulled a "revolver pistol" out and pointed it through the window of the truck at defendant. Later, Southwick said, "I can't stand that nigga." Williams witnessed another incident, an argument between Southwick and Criger, in which the two came running down the stairs and, after Criger slipped and fell, Southwick pointed a rifle at Criger's head.

Shannon Hamilton, defendant's second cousin, testified that, in late-2013 or early-2014, she witnessed two incidents between Southwick and defendant. The first incident occurred when she saw Southwick burst out of the house with a gun in his waistband, run up to the fence, and yell at defendant and Thompson (Hamilton's uncle), "I kill you mother fuckers. You mother fucker's [*sic*] get away from here. You want to fuck with me, I'll kill you." The second incident occurred several days later when she was walking with Thompson and defendant and Southwick burst through the back gate waving a gun yelling, "I'm going to kill you mother fuckers. Didn't I tell you all you can't walk through here. I'll kill y'all." Hamilton did not call the police because she did not feel threatened by Southwick.

Clarke testified that after defendant was kicked out of Criger's home, she continued to live there for a month. When Southwick heard defendant was coming over to visit her, Southwick would say, "That nigger is no good. You need to get away from him. He's a piece of shit." Southwick would also regularly say, "I could sneak up on him [defendant] and slice him up, and he'd never even know it."

PROCEDURAL HISTORY

Defendant was charged with assault with a deadly weapon (count one), battery resulting in great bodily injury (count two), misdemeanor possession of marijuana, and misdemeanor possession of drug paraphernalia. The information alleged that, as to count one, defendant inflicted great bodily injury on the victim and, as to count two, defendant

8

personally used a deadly and dangerous weapon, a knife. The information further alleged defendant had a prior strike.

Defendant waived his right to a jury trial on the prior strike allegation. Defendant was tried by a jury on counts one and two and found guilty on those counts. The jury found true the related enhancements. In a bifurcated proceeding, the trial court found true the prior strike allegation.

At sentencing, the trial court denied defendant's *Romero* motion to strike the prior strike conviction. The court denied probation and sentenced defendant to three years (the middle term) on count one, doubled for the prior strike, plus five years for the prior serious felony conviction and three years for the great bodily injury enhancement, for an aggregate term of 14 years in state prison. The court imposed fees and fines and awarded defendant presentence custody credit. The remaining counts were dismissed in the interest of justice.

Defendant filed a timely notice of appeal.

DISCUSSION

I

*The Self-Defense Contention*

Defendant contends there was insufficient evidence to support his convictions for assault with a deadly weapon and battery resulting in great bodily injury because he acted in self-defense. He claims his "apprehension" of Southwick was reasonable in light of Southwick's history of verbally assaulting him while displaying weapons in a threatening manner. He went to Southwick's neighborhood, bringing with him a small folding knife, because he "may have reached the point he wanted to resolve the issues with Southwick." Then, when Southwick "rapidly approached and appeared ready to fight," defendant stabbed Southwick in self-defense. The claim lacks merit.

In reviewing a challenge to the sufficiency of the evidence, our "task is to determine whether, in light of the whole record viewed in the light most favorable to the

9

prosecution, a rational trier of fact could have found the elements of the crime beyond a reasonable doubt." (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1624.) We " ' "must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" ' [Citations.]" (*People v. Smith* (2005) 37 Cal.4th 733, 739.) "The credibility of witnesses and the weight accorded the evidence are matters within the province of the trier of fact." (*People v. Ramos* (2004) 121 Cal.App.4th 1194, 1207.) We " 'must accept logical inferences that the [trier of fact] might have drawn from the evidence even if [we] would have concluded otherwise. [Citation.]' [Citation.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.) "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the trier of fact's finding.]' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Penal Code "Section 245, subdivision (a)(1), punishes assaults committed by the following means: 'with a deadly weapon or instrument other than a firearm,' or by 'any means of force likely to produce great bodily injury.' " (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028.) "To justify an act of self-defense for such a charge [of assault with a deadly weapon], the defendant must have an honest *and reasonable* belief that bodily injury is about to be inflicted on him." (*People v. Goins* (1991) 228 Cal.App.3d 511, 516.)

"It is well established that the ordinary self-defense doctrine--applicable when a defendant *reasonably* believes that his safety is endangered--may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. (See generally, 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Defenses, § 245, p. 280; 2 Robinson, Criminal Law Defenses (1984) § 131(b)(2), pp. 74-75.) It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances." (*In re Christian S.* (1994) 7 Cal.4th

10

768, 773, fn. 1.)  Imperfect self-defense is not available unless " 'the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant.' " (*People v. Frandsen* (2011) 196 Cal.App.4th 266, 274.)

As the People aptly note, the jury was instructed at length regarding defendant's claim of self-defense.  In particular, the trial court instructed the jury that "[s]elf-defense is a defense to all the crimes charged" and instructed on the elements necessary to find defendant acted in lawful self-defense, including a reasonable belief of immediate danger of bodily injury or unlawful touching and a reasonable belief "immediate use of force was necessary to defend against that danger."  The jury was further instructed it could find defendant's belief he was threatened was reasonable even if he relied on false information so long as he "actually and reasonably . . . believed that the information was true."  The jury was instructed that in deciding whether defendant's conduct and beliefs were reasonable, it could consider whether defendant was threatened or harmed by Southwick in the past.  Further instruction was given on the People's burden of proving beyond a reasonable doubt defendant did not act in self-defense, on mutual combat, and on provocation.

Self-defense was also discussed at length in closing argument.  The prosecution argued defendant was the initial aggressor in the fight with Southwick, he went to Southwick's home and called him out, advanced on an unarmed Southwick and, even assuming it became a mutual combat situation, used more force than necessary, to wit, deadly force against Southwick.

Defendant's counsel argued at length that based on Southwick's prior threats of harm to defendant and others, defendant had ample reason to fear Southwick.  On the day of the stabbing, after being chased off by Southwick, defendant returned with Antoine to go to defendant's aunt's house and was simply standing on a public street when

11

Southwick "came at him." Counsel argued defendant simply stood his ground and defended himself by stabbing Southwick.

The evidence here showed that defendant initiated the confrontation with and used deadly force against an unarmed Southwick, which supported the jury's determination that defendant did not act in self-defense. (*In re Christian S.*, *supra*, 7 Cal.4th at p. 773.) After a verbal argument with Southwick, defendant returned with Antoine to Southwick's home, called Southwick out of the house, and challenged him to fight. Southwick came out of his home unarmed and approached defendant, who was carrying a pocketknife and, according to defendant's own trial testimony, was "on methamphetamine." When Southwick, who was unarmed, was more than 20 feet away from him, defendant pulled the knife from his pocket. Southwick approached to within six or seven feet and put his hands up as if ready to fight. Defendant swung his arm around and stabbed Southwick in the back.

Defendant initially lied and told Detective Mullaly and Officer Pullen that he went to Southwick's home alone and that Southwick had a gun. However, he later admitted having lied about Southwick having a gun and about being by himself during the confrontation. He admitted to Mullaly that he and Antoine went to Southwick's home to fight Southwick, Southwick came outside with no weapon, Southwick approached and took a fighting stance, and defendant stabbed him.

Defendant claims he had an honest and reasonable belief that there was a "potential for serious injury if he got into an altercation with Southwick" and, when "Southwick rapidly approached and appeared ready to fight," he stabbed him in self-defense. But the jury determined to the contrary in rejecting his claim of self-defense, impliedly finding it was defendant who initiated the altercation when he armed himself with a knife and returned to Southwick's home with Antoine, called out and challenged Southwick, and stabbed Southwick knowing he was unarmed.

12

The jury, having heard testimony from various witnesses (including defendant himself) and having been fully instructed on self-defense, rejected defendant's claim of self-defense and found him guilty of the assault and battery charges. There is substantial evidence to support the jury's verdicts.

II

*Denial Of Romero Motion*

Defendant contends the trial court abused its discretion in denying his *Romero* motion to dismiss his 1997 strike conviction. We disagree.

The prior strike at issue is defendant's October 30, 1997, voluntary manslaughter conviction in Omaha, Nebraska. According to the probation report, defendant and his then-girlfriend were at a bar when a fight among a group of patrons broke out. The people involved in the fight were escorted out of the bar, but the fight continued. Defendant "produced a handgun and fired multiple shots, striking the 22-year old, male victim Alfred G. in the chest." The victim later died at the hospital. Defendant acknowledged he shot the victim but claimed he did so in self-defense. "According to the defendant, Alfred attempted to punch him, but struck his girlfriend after he moved to avoid the blow. Alfred then swung at the defendant a second time. The defendant indicated he believed Alfred had a gun or knife in his hand because he observed something shiny. At that time, the defendant removed a gun from his pocket and shot Alfred." Defendant was charged with manslaughter and use of a deadly weapon to commit a felony. He pled no contest to manslaughter in exchange for dismissal of the remaining count and a sentence of two to five years in state prison.

At the current trial, defendant testified he and his then-girlfriend went to a bar. When a fight broke out between other bar patrons, defendant and his girlfriend left through the front door. The victim also left the bar, approached defendant, and punched defendant's girlfriend in the face. When defendant said, "What's [u]p with you," the victim pulled out a gun and put it to defendant's head. Defendant pulled his own gun out

13

of his pocket and shot the victim. The victim "took off running behind the bar." Defendant heard four more shots, but denied firing any more himself.

On cross-examination, defendant testified the victim told his girlfriend, "Bitch, you too good to dance with somebody -- dance with me," and then punched her. However, he confirmed having told a detective at the time that when he and his girlfriend "got out the door, there was a guy standing outside and he was like, what's up? He kept saying, what's up, blood, to me and I was like, man, go on. What you doing? Go home, you know, and he was like, what's up, what's up." He also confirmed having told the detective that the victim "was swinging at me, but he missed because she was standing right in front of me. And when he swung, I had moved back, and he hit her right in the head." At that point, defendant put his hand in his pocket. When the victim pulled out a gun and put it to defendant's head, defendant pulled his gun out of his pocket and shot the victim in the neck. Defendant acknowledged he never told the detective that the victim held a gun to his head; rather, he said the victim swung at him and he pulled out the gun and fired in the air. He also acknowledged he actually fired the gun "[m]aybe two or three times," shooting the victim once and then shooting in the air. Defendant testified he bought the gun "off the streets," but acknowledged having told the detective, "I got it from a guy [who] had asked me to hold on to it for him."

This state's highest court held, in *Romero*, that trial courts have discretion under Penal Code section 1385 to dismiss a prior strike when a court finds a defendant falls outside the spirit of the three strikes law. (Pen. Code, § 1385; *People v. Superior Court (Romero)*, *supra*, 13 Cal.4th at pp. 529-530.) In deciding whether to exercise this discretion, the court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he

14

had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

A trial court's "failure to . . . strike a prior [felony] conviction allegation is subject to review under the deferential abuse of discretion standard." (*People v. Carmony* (2004) 33 Cal.4th 367, 374.) "[A] trial court will only abuse its discretion in failing to strike a prior felony conviction allegation in limited circumstances." (*Id.* at p. 378.) "In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve the legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' [Citations.] Second, a ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' [Citation.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at pp. 376-377.)

Defendant contends his prior felony conviction for voluntary manslaughter, for which he received a two-year state prison sentence, occurred some 17 years before the current offense and, since his release from prison in 1999, he had no additional felony convictions and only two misdemeanor convictions (one in 2002 and one in 2013), both of which resulted in grants of probation. However, the trial court concluded the nature of the prior strike -- the "killing of another human being" -- counterbalanced the "substantial amount of time between the prior felony conviction and the current felony conviction."

As the court further observed, defendant "had not led a legally blameless life in the interim." On September 2, 2002, just three years after his release from prison, defendant was convicted of assaulting his girlfriend. He served 30 days in county jail and

was granted probation. Then, on August 5, 2013, defendant was convicted of corporal injury on another girlfriend, who claimed defendant "punched her with a closed fist multiple times, including the face, grabbed her face across her eyes with his hand, and threw her to the ground during an argument." Again, he was granted probation and ordered to serve 30 days in county jail and participate in a 52-week batterer's treatment program. According to defense counsel, he never completed that program. Within a year, he committed the current violent offense against Southwick. It can hardly be said defendant remained crime-free or that his prior strike conviction is too remote. (*People v. Williams*, *supra*, 17 Cal.4th at p. 163 [13 years between prior and current felony "not significant" because the defendant did not refrain from criminal activity]; *People v. Philpot* (2004) 122 Cal.App.4th 893, 906; *People v. Humphrey* (1997) 58 Cal.App.4th 809, 813.)

Defendant claims the two-year sentence suggests there were mitigating factors and the "probability" that his conduct may have been provoked by the victim's own aggressive behavior. While it is true defendant received a sentence of two to five years for the manslaughter conviction, his sentence was the result of a plea, the details of which were not made a part of this record. Thus, despite defendant's self-serving explanation, we will not speculate as to the countless possible reasons for the Nebraska court's sentencing decision.

Next, defendant claims more consideration should have been given to the historical relationship between him and Southwick, particularly the fact that "Southwick's claims about [defendant] were not supported by any evidence" and Southwick exhibited weapons in a threatening manner toward defendant and others, and but for Southwick's "prolonged period of abusive and threatening behavior" toward him, the stabbing incident likely would not have occurred. The claim is unpersuasive. As a preliminary matter, defendant's *Romero* motion failed to raise the issue, and defense counsel's argument at the *Romero* hearing only mentioned in passing "the provocation by

16

the victim which was brought out at trial." More importantly, however, defendant's own testimony at trial acknowledged he went to Southwick's home, called Southwick out of the house, and challenged him to fight. Then, when Southwick came out of his home *unarmed* and approached defendant with his hands up in a fighting position, defendant stabbed him. On this record, we have no reason to suspect the trial court failed to consider all relevant information in making its determination not to strike the prior strike conviction.

Finally, defendant speculates he still would have suffered a lengthy sentence of 11 years had the trial court struck the prior strike conviction. Even assuming defendant's observations were true, we decline to second-guess the trial court and substitute our own opinion. (*People v. Williams*, *supra*, 17 Cal.4th at pp. 158-161.) In any event, the trial court, having considered the evidence at trial, the written and oral arguments of the parties, and the probation report, concluded there would be no "unjust sentence as a result of a finding of three-strikes law" and "*based on all of the factors*, it does appear that this falls clearly within the spirit of the three-strikes law." (Italics added.) Accordingly, we conclude there was no abuse of discretion.

DISPOSITION

The judgment is affirmed.

/s/
Robie, Acting P. J.

We concur:

/s/
Mauro, J.

/s/
Duarte, J.

17